**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **TRUE RETURN SYSTEMS LLC,** | |
| **Plaintiff,** | Case No. 22-cv-8478 |
| **v.** | **JURY TRIAL DEMANDED** |
| **MAKERDAO,** | |
| **Defendant.** | |

**COMPLAINT FOR PATENT INFRINGEMENT**

1.      True Return Systems LLC ("True Return" or "Plaintiff"), by and through its counsel, hereby brings this action for patent infringement against MakerDAO ("MakerDAO" or "Defendant"), a decentralized autonomous organization, alleging infringement of U.S. Patent No. 10,025,797 (the "Patent-in-Suit" or the "'797 Patent"), titled "METHOD AND SYSTEM FOR SEPARATING STORAGE AND PROCESS OF A COMPUTERIZED LEDGER FOR IMPROVED FUNCTION," a copy of which is attached as Exhibit 1.

**NATURE OF THE ACTION**

2.      This is an action for patent infringement arising under the United States Patent Act 35 U.S.C. §§ 101 et seq., including 35 U.S.C. § 271.

**PARTIES**

3.      True Return is limited liability company organized and existing under the laws of the state of Connecticut with its principal place of business located at 253 Turtle Back Road, New Canaan, CT 06840.

4.      Upon information and belief, MakerDAO is a decentralized autonomous organization ("DAO") controlled and operating at the Ethereum blockchain contract address 0x9f8f72aa9304c8b593d555f12ef6589cc3a579a2    and    operating    from    the    website https://makerdao.com/en/. MakerDAO's governance and administration are run through the MakerDAO forum website https://forum.makerdao.com/.

5.      On information and belief, MakerDAO was launched by Rune Christensen and the MakerDAO Foundation in late 2017.

6.      MakerDAO was launched for the principal purposes of issuing a Dai stablecoin currency. The ownership and governance rights over MakerDAO are represented by MKR tokens created and distributed by MakerDAO. MakerDAO itself, and the MakerDAO Foundation have been holders of MKR tokens. The MakerDAO Foundation has a listed address of 110 Cooper Street, Santa Cruz, CA 95060, but on information and belief, MakerDAO operates, by design, without a U.S. address or location, and the MakerDAO Foundation initiated steps to turn over administration and control of MakerDAO to the holders of MakerDAO's MKR token in 2020. *See* "The Transfer of MKR Token Control to Governance: The Final Step," MakerDAO Blog, March 25, 2020, https://blog.makerdao.com/the-transfer-of-mkr-token-control-to-governance-the-final-step.

7.      On information and belief, MakerDAO converted its oracles system and processes from "Oracles v1" to "Oracles v2" between late 2019 and early 2020. In a February 27, 2020, MakerDAO forum post titled "Scientific Governance and Risk – Thursday, February 27 9AM PST" (https://forum.makerdao.com/t/agenda-discussion-scientific-governance-and-risk-thursday-february-27-9am-pst-5-00-pm-utc/1365), MakerDAO contrasted Oracles v1 with Oracles v2. A primary Oracles v1 shortcoming is described as "From a computational/operational point of view,

the Oracle v1 is wasteful as every feed needs to make an on-chain transaction with every update to the Medianizer." Oracles v2 is highlighted as having differences and benefits which include: "Oracles v2 was released alongside MCD. It addresses some of the problems of scalability, liability, and cost." and "One major difference between Oracle V2 and Oracle V1 is that a lot of the process has been moved off-chain. Asset prices are signed using Ethereum keys." The oracles systems and processes are components of MakerDAO which gather, store, and deliver electronic values including published price level data.

8.      Investment and ownership tokens in MakerDAO are freely tradable in the U.S. on the largest cryptocurrency exchanges including Coinbase, Gemini, and Kraken. Similarly, access to MakerDAO's Dai-based services is available throughout the U.S.

9.      On information and belief, MakerDAO operates as a decentralized autonomous organization (a "DAO"), and it is not formally organized as a corporation, LLC, partnership, or other recognized organization type which would serve to limit the liability of its MKR token owners. MakerDAO operates a cryptocurrency financial services business through its website and its address on the Ethereum blockchain network. MakerDAO's primary financial service activity involves the issuance of its own U.S. dollar linked algorithmic stablecoin called "Dai"; Dai is the primary means of exchange into and out of the MakerDAO platform, and Dai is used as a fractional reserve currency for MakerDAO's cryptocurrency lending business. MakerDAO business operations effectively combine the activities of a central bank with those of a conventional securities market broker-dealer.

10.     In a DAO, there is generally no formal corporate structure, no explicit liability protection, and no distinction between managers and directors, or between general and limited partners. Instead, holders of specific tokens, such as the MKR, have governance rights that allow

holders to propose and approve actions that MakerDAO will take. Actions include many of those typically done by corporate officers, boards, or employees, such as spending treasury funds to hire people; changing organizational goals and policies; and even distributing treasury assets to MKR tokenholders, like how corporations can authorize dividends or other distributions of profits. Holders of governance tokens thus may participate in the governance of a protocol, they have a potential claim on its profits, and they share responsibility for its liabilities.

## JURISDICTION AND VENUE

11.     This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 101, et seq.

12.     This Court has exclusive subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). This Court has personal jurisdiction over Defendant because it has engaged in systematic and continuous business activities in this District. As described below, Defendant has committed acts of patent infringement giving rise to this action within this District.

13.     The Court has personal jurisdiction over Defendant for the following reasons: (1)

14.     Defendant is present within or has minimum contacts within the State of New York and the Southern District of New York; (2) Defendant has purposefully availed itself of the privileges of conducting business in the State of New York and in this district; (3) Defendant has sought protection and benefit from the laws of the State of New York; (4) Defendant regularly conducts business within the State of New York and within this district, and Plaintiff's cause of action arises directly from Defendant's business contacts and other activities in the State of New York and in this district; and (5) Defendant has purposely availed itself of the privileges and benefits of the laws of the State of New York.

15.     Defendant, directly and/or through intermediaries, distributes, uses, offers for sale, sells, and/or advertises products and services in the United States, the State of New York, and the

Southern District of New York including but not limited to the products which contain the infringing elements as detailed below. Upon information and belief, Defendant has committed patent infringement in the State of New York and in this district; Defendant solicits and has solicited customers in the State of New York and in this district; and Defendant has paying customers who are residents of the State of New York and this district and who each use and have used the Defendant's products and services in the State of New York and in this district.

16.    Venue is proper in this District under 28 U.S.C. § 1400(b), because Defendant has committed acts of patent infringement in this District. In addition, Plaintiff has suffered harm in this District.

## TRUE RETURN AND THE '797 PATENT

17.    True Return was founded by Jack Fonss.

18.    Mr. Fonss is a technology consultant focusing on financial technology (FinTech) platforms and offerings. After college, Mr. Fonss was a computer programmer and systems analyst at both McKinsey & Company and Morgan Stanley & Co on a range of platforms, operating systems, and computer languages. He has consulted for numerous asset managers and technology companies on a wide variety of FinTech issues related to funds, trading systems, and digital currencies.

19.    Mr. Fonss founded and managed AccuShares Investment Management, LLC ("AccuShares"), a FinTech startup offering innovative technological solutions to problems limiting exchange traded funds. While running AccuShares, Mr. Fonss was the principal inventor of a range of systems and software technologies which have been adopted by many crypto-currency, digital money, and exchange middleware environments.

20.     By 2015, Mr. Fonss recognized that distributed computerized ledger technology (including blockchain technology) provided the potential to improve computer system environments and their interaction with real-world assets and electronically published data sources. In particular, Mr. Fonss' work included the design and integration of separate linked ledgers and architectures for computer system efficiency, security and persistent auditability.

21.     Mr. Fonss worked through the issues and invented distributed computerized ledger technologies that could, among other applications, efficiently integrate on-chain and off-chain data and processes for improved computer system efficiency and security. He filed a provisional patent application for his invention with the U.S. Patent and Trademark Office on February 23, 2018. and a non-provisional patent application on March 16, 2018.

22.     On July 17, 2018, the U.S. Patent and Trademark Office duly and legally issued U.S. Patent No. 10,025,797 (the "'797 Patent"), naming Jack Fonss as the inventor. The '797 Patent is entitled "Method and System for Separating Storage and Process of a Computerized Ledger for Improved Function." A true and correct copy of the '797 Patent is attached hereto as Exhibit 1.

23.     The '797 Patent is generally directed to systems and methods that improve distributed-ledger technology by addressing computational, time, storage, and security constraints inherent to distributed ledgers (such as blockchains). The general approach of the '797 Patent is to separate certain processing and storage functions from a base distributed computerized ledger (such as a blockchain) but link such separated processing and storage to the base distributed computerized ledger.



FIG. 18

24.     The systems and methods of the '797 Patent can be generally understood with reference to the exemplary embodiment depicted in Figure 18 of the '797 Patent, which is reproduced in annotated form below.

25.     An exemplary differentials processing/storage system (in green) includes a differentials computer node (item 191) and a differential storage unit (item 188) linked to one or more electronically published time-sequenced data streams or descriptive differentials (items 183, 184, 185, in orange). The system processes (187) data from the data stream / descriptive differentials (183, 184, 185) and stores the processed data on the differential storage unit (188). For example, the system may process logistical data provided by a shipping network, financial data and market prices provided by an exchange, or information provided by a news outlet.

26.     The differentials processing/storage system (in green) is also linked to a base distributed computer ledger ("DCL," 181, in cyan) that includes one or more transaction records.

The system processes (187, 190, 191) differential data (188) to link the differential data (188) to the DCL, which can then, e.g., update a transaction record of the DCL (181) according to the differential data (188).

27.     This system improves over the prior-art distributed computerized ledgers in several ways including moving certain functionality and storage off the DCL while simultaneously allowing the DCL to utilize exogenous data to update transaction records on the DCL. This is possible because the differentials processing/storage system links the DCL to the exogenous data while keeping and implementing certain computing-intense processes and storage-intense data so that the DCL is not burdened with such. This provides several technological advantages. For instance, processing and storage constraints inherent to a DCL are overcome by shifting certain processing and storage to a differentials processing/storage system. Similarly, security issues related to exposing DCL processes to the public are ameliorated by shifting processes to the differentials processing/storage node. Through a layered or parallel architecture, system access, processing, and storage can be performed more efficiently, and distributed ledgers such as blockchains can realize increased functionality.

28.     The '797 Patent is valid and enforceable.

29.     The '797 Patent is directed to patentable subject matter.

30.     True Return is the assignee of all right, title, and interest in the '797 Patent including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant times against infringers of the '797 Patent. Accordingly, True Return possesses the exclusive right and standing to prosecute the present action for infringement of the '797 Patent by Defendant.

## **MAKERDAO**

31.     MakerDAO provides methods and systems that use a processing/storage system to link published data to a distributed computerized ledger, specifically a blockchain.

32.    MakerDAO establishes the MakerDAO blockchain data environment which includes the MakerDAO Multi-Collateral Dai (MCD) System, the Oracle Security Module, and related system components. The MakerDAO blockchain data environment creates and manages the MakerDAO Dai (stablecoin) and MKR ownership interests.

33.    MakerDAO is a self-described "Decentralized Autonomous Organization" and MakerDAO operates autonomously, carrying out the business of creating and maintaining its stable coin currency token Dai, and running its decentralized ecosystem for the benefit and profit of the MKR token owners.

34.    Similar to traditional partnership arrangements, MakerDAO's governance and voting are highly concentrated among a small number of blockchain identities. In three recent governance matters reported on the Maker Governance Voting Portal (https://vote.makerdao.com/), "Ratification Poll for Modify Dai Foundation Core Unit Budget (MIP 40c3-SP74)", "Add RWA-009 (HVBank) as a new Vault Type", and "Ratification Poll for Onboard Growth Task Force (MIP75c3-SP1)", 10 to 15 individual blockchain identities cast 80% to 90% of the total votes.

35.    Similar to conventional businesses and investment arrangements, MakerDAO maintains many supporting individuals and teams, and MKR owners rely on their efforts to service, safeguard, operate, and improve the MakerDAO business. From the MakerDAO Whitepaper (https://makerdao.com/en/whitepaper/ ), "DAO teams consist of individuals and service providers, who may be contracted through Maker Governance to provide specific services to MakerDAO." and "Examples of DAO team member roles are the Governance Facilitator, who supports the communication infrastructure and processes of governance, and Risk Team members, who support

Maker Governance with financial risk research and draft proposals for onboarding new collateral and regulating existing collateral."

36.     The MKR token is the investable unit for the ownership, operation, and governance of the MakerDAO blockchain integrated system. MakerDAO's ownership and governance, through the MKR token, enables MakerDAO owners to make proposals, vote on proposals, and profit from the activities and operations of MakerDAO and its technology. MakerDAO produces financial reports (on its website "forum.makerdao.com") which report metrics including income for MKR owners.

37.     During 2022, MakerDAO has generally maintained the number of outstanding MKR tokens to between 975,000 and 1,000,000 for the purposes of ownership and funding, governing, and promoting MakerDAO. The market value of MKR ownership tokens as of as of quarter end March 31, 2022, was approximately $2 billion. The market value of MakerDAO's Dai stablecoin currency as of quarter end March 31, 2022, was approximately $9.6 billion.

38.     MakerDAO develops and promotes the MakerDAO blockchain environment to individuals and institutions in the U.S. in large part to expand the use and adoption of the MKR token and thereby increase the value of the MKR token. MakerDAO produces financials and performance reports for the benefit of its owners. So called "Real World Finance Core Unit Reports" are published on the MakerDAO forum (forum.makerdao.com). Monthly financials are reported at Finance@MakerDAO (*https://finance.makerdao.network).*

39.     MakerDAO has many sources of income from its decentralized autonomous organization platform. Since the creation and build-out of the MakerDAO Multi-Collateral Dai (MCD) System (which incorporates the MakerDAO's Oracle Security Modules), MakerDAO has

collected revenue, including amounts from its "Stability Fee." The Stability Fee is directly related to the data storage technology incorporated in the MakerDAO Oracles Security Modules.

40.     On information and belief, MakerDAO (the DAO itself) has owned and controlled more than 20% of the MKR tokens.

## THE MAKERDAO SYSTEM

41.     MakerDAO authored and published a whitepaper titled "The Maker Protocol: MakerDAO's Multi-Collateral Dai (MCD) System" ("MakerDAO Whitepaper"). A true and correct copy of this publication is attached hereto as Exhibit 2.

42.     In the MakerDAO Whitepaper, MakerDAO states: "MakerDAO is an open-source project on the Ethereum blockchain and a Decentralized Autonomous Organization . . . ."

43.      In the MakerDAO Whitepaper, MakerDAO states: "Dai is a decentralized, unbiased, collateral-backed cryptocurrency soft-pegged to the US Dollar."

44.     In the MakerDAO Whitepaper, MakerDAO states: "Maker Governance is the community organized and operated process of managing the various aspects of the Maker Protocol. Dai is a decentralized, unbiased, collateral-backed cryptocurrency soft-pegged to the US Dollar."

45.     In the MakerDAO Whitepaper, MakerDAO states: "To protect the system from an attacker attempting to gain control of most of the Oracles, the Maker Protocol receives price inputs through the Oracle Security Module (OSM), not from the Oracles directly. The OSM, which is a layer of defense between the Oracles and the Protocol, delays a price for one hour, allowing Emergency Oracles or a Maker Governance vote to freeze an Oracle if it is compromised."

46.     In the MakerDAO Whitepaper, MakerDAO states: "A large Vault becomes undercollateralized due to market conditions. An Auction Keeper then detects the undercollateralized Vault opportunity and initiates liquidation of the Vault, which kicks off a Collateral Auction for, say, 50 ETH."

47.     In the MakerDAO Whitepaper, MakerDAO states: "The Maker Protocol requires real-time information about the market price of the collateral assets in Maker Vaults in order to know when to trigger Liquidations."

48.     MakerDAO authored and published a website page titled "Security - How the Maker Protocol handles the security of oracles" (Security Website Page). A true and correct copy of this publication is attached hereto as Exhibit 3.

49.     On the Security Website Page, MakerDAO states: "Oracle Security Modules (OSMs) delay the publishing of new reference prices for a predefined set of time. This parameter is called the Oracle Security Module Delay and was set to be one hour at the launch of MCD."

50.     On the Security Website Page, MakerDAO states: "The Oracle Security Module (OSM) safeguards the process by delaying price-feed data for one hour."

51.     On the Security Website Page, MakerDAO states: "Oracles use the median of the reported prices for each asset as the reference price. Using a median instead of an average makes it harder to manipulate the reference price since control over half of the data providers is needed in order for a fraudulent price to be pushed through."

52.     On the Security Website Page, MakerDAO states: "At the launch of Multi-Collateral Dai, oracles received data from a total of 20 Feeds which consisted of 15 individuals and five public organizations."

53.     On the Security Website Page, MakerDAO states: "There are two types of Feeds; Dark Feeds run by anonymous individuals, and Light Feeds run by public organizations. Individuals consist of people internal to Maker, influential people in the greater crypto community, as well as some community members."

54.     On the Security Website Page, MakerDAO states: "The oracle system for the Maker Protocol uses decentralized reporting to defend against fraudulent price data."

55.     On the Security Website Page, MakerDAO states: "This allows MKR token holders and other stakeholders the time to react to bugs or attacks on the Oracles. An OSM is active on each Oracle in the Maker Protocol."

56.     On the Security Website Page, MakerDAO states: "A Medianizer is a type of smart-contract in the Maker Protocol's Oracle system that collects price-data from Feeds and calculates a reference price by calculating a median."

57.      MakerDAO authored and published a document titled "MakerDAO Documentation." A true and correct copy of this publication is attached hereto as Exhibit 4.

58.     In the MakerDAO Documentation, MakerDAO states: "The Maker Protocol is the platform through which anyone, anywhere can generate the Dai stablecoin against crypto collateral assets."

59.     In the MakerDAO Documentation, MakerDAO states: "MakerDAO is a decentralized organization dedicated to bringing stability to the cryptocurrency economy."

60.     In the MakerDAO Documentation, MakerDAO states: "There are multiple organizations and individuals who report price-data, they are called Feeds."

61.     In the MakerDAO Documentation, MakerDAO states: "With the new version of the Maker Protocol, Multi Collateral Dai (MCD), being released and live on the main Ethereum network."

62.     MakerDAO authored and published a document titled "Median – Detailed Documentation."  A true and correct copy of this publication is attached hereto as Exhibit 5.

63.     In Median – Detailed Documentation, MakerDAO states: "Every time a new list of prices is received, the median of these is computed and used to update the stored value."

64.     In Median – Detailed Documentation, MakerDAO states: "…the price ( val ) is intentionally kept not public because the intention is to only read it from the two functions read and peek, which are whitelisted. This means that you need to be authorized."

65.     In Median – Detailed Documentation, MakerDAO states: "The bud is modified to get whitelisted authorities to read it on-chain (permissioned), whereas everything of off-chain is public."

66.      In Median – Detailed Documentation, MakerDAO states: "In the case of it being an authorized oracle, it will check if it signed the message with a timestamp that is greater than the last one. This is done for the purpose of ensuring that it is not a stale message. The next step is to check for order values, this requires that you send everything in an array that is formatted in ascending order."

67.     In Median – Detailed Documentation, MakerDAO states: "ETHUSD shutdown (can still add collateral and pay back debt - increases safety) but you cannot do anything that increases risk (decreases safety - remove collateral, generate dai, etc.) because the system would not know if you would be undercollateralized."

68.     MakerDAO authored and published a document titled "Maker Protocol 101." A true and correct copy of this publication is attached hereto as Exhibit 6.

69.     In Maker Protocol 101, MakerDAO states: "Vat - The single source of truth for the Maker Protocol. It contains the accounting system of the core Vault, Internal Dai balances, and collateral state. The Vat has no external dependencies and maintains the central "Accounting Invariants" of the Maker Protocol. It houses the public interface for Vault management, allowing

urn (Vault) owners to adjust their Vault state balances.  It also contains the public interface for Vault fungibility, allowing urn (Vault) owners to transfer, split, and merge Vaults. Excluding these interfaces, the Vat is accessed through trusted smart contract modules."

70.     In Maker Protocol 101, MakerDAO states: "Any time the collateral value of a Vault gets closer to its debt, it becomes "risky-er." The system liquidates Vaults that get too risky."

71.     In Maker Protocol 101, MakerDAO states: "Component Spotter - The Maker Protocol requires real time information about the market price of the assets used as collateral in Vaults. Ultimately, this market price determines the quantity of Dai that can be minted, as well as the grab condition for Vault liquidations. The oracle module handles how markets prices are recorded on the blockchain."

72.     In Maker Protocol 101, MakerDAO states: "An oracle module is deployed for each collateral type. It feeds price data for a corresponding collateral type to the Vat."

73.     In Maker Protocol 101, MakerDAO states: "Components: Dai - An extension from DS-Token and standard ERC20 token interface. Contains the database of Dai token owners, transfer, approval, and supply logic."

74.     In Maker Protocol 101, MakerDAO states: "The oracle module handles how markets prices are recorded on the blockchain."

75.     MakerDAO authored and published a document titled "Transaction Manager." A true and correct copy of this publication is attached hereto as Exhibit 7.

76.     In Transaction Manager 101, MakerDAO states: "The transactionManager service is used to track a transaction's status as it propagates through the blockchain."

77.     In Transaction Manager 101, MakerDAO states: "Methods in Dai.js that start transactions are asynchronous, so they return promises. These promises can be passed as

arguments to the transaction manager to set up callbacks when transactions change their status to pending, mined, confirmed or error."

78.     MakerDAO authored and published a document titled "Introducing Oracles V2 and DeFi Feeds." A true and correct copy of this publication is attached hereto as Exhibit 8.

79.     In Introducing Oracles V2 and DeFi Feeds, MakerDAO states: "The published prices are pooled together into a canonical price in a smart contract that can then be used by a decentralized application (dapp)."

80.     In Introducing Oracles V2 and DeFi Feeds, MakerDAO states: "Oracles, collectively, are a mechanism to broadcast data from outside of the blockchain onto the blockchain."

81.     MakerDAO authored and published a document titled "Oracle Security Module (OSM) - Detailed Documentation." A true and correct copy of this publication is attached hereto as Exhibit 9.

82.     In Oracle Security Module (OSM), MakerDAO states: "The OSM (named via acronym from "Oracle Security Module") ensures that new price values propagated from the Oracles are not taken up by the system until a specified delay has passed."

83.     In Oracle Security Module (OSM), MakerDAO states: "The central mechanism of the OSM is to periodically feed a delayed price into the MCD system for a particular collateral type. For this to work properly, an external actor must regularly call the poke() method to update the current price and read the next price."

84.     In Oracle Security Module (OSM), MakerDAO states: "Values are read from a designated DSValue contract (its address is stored in src). The purpose of this delayed updating mechanism is to ensure that there is time to detect and react to an Oracle attack (e.g., setting a

collateral's price to zero). Responses to this include calling stop() or void() or triggering Emergency Shutdown."

85.     MakerDAO authored and published a document titled "uniswap-price-feed." A true and correct copy of this publication is attached hereto as Exhibit 10.

86.     In uniswap-price-feed MakerDAO states: "Prices are retrieved from chain every second. The average of last 60 prices are reported to subscribed clients."

87.     In uniswap-price-feed MakerDAO states: "The primary and only entity this service operates on is feed. Each feed is effectively a stream of timestamped records. Timestamps never go back, and it is always guaranteed that new records will be added 'after' the existing ones. This simplification makes feed streams consumption much easier for clients."

88.     In uniswap-price-feed MakerDAO states: "Each record is represented throughout the service as a JSON structure with two fields: timestamp and data. The first one is a UNIX epoch timestamp represented as a number (either integer or floating-point). The latter can be basically anything."

### FIRST CLAIM FOR RELIEF
### (Infringement of U.S. Patent No. 10,025,797)

89.     True Return incorporates by reference its allegations in the preceding paragraphs of this Complaint.

90.     **Direct Infringement.** Defendant has been and continues to directly infringe one or more claims of the '797 Patent in at least this District by making, using, offering to sell, selling and/or importing, without limitation, at least the products identified in the charts incorporated into this Count below (among the "Exemplary Defendant Products") that infringe at least the exemplary claims of the '797 Patent also identified in the charts incorporated into this Count below (the "Exemplary '797 Patent Claims") literally or by the doctrine of equivalents. On information and

belief, numerous other devices that infringe the claims of the '797 Patent have been made, used, sold, imported, and offered for sale by Defendant and/or its customers.

91.     Defendant also has and continues to directly infringe, literally or under the doctrine of equivalents, the Exemplary '797 Patent Claims, by having its employees and administrators internally test and use these Exemplary Products.

92.     Defendant has had knowledge and notice of the '797 Patent, as well as of its own infringement of the '797 Patent, at least since the date of the filing of the present Complaint.

93.     Despite such actual knowledge, Defendant continues to make, use, test, sell, offer for sale, market, and/or import into the United States, products that infringe the '797 Patent. On information and belief, Defendant has also continued to sell the Exemplary Defendant Products and distribute product literature and website materials inducing end users and others to use its products in the customary and intended manner that infringes the '797 Patent. Thus, on information and belief, Defendant is contributing to and/or inducing the infringement of the '797 Patent.

94.     On information and belief, Defendant's infringement of the '797 Patent has been and continues to be willful.

95.     Defendant's infringement of the '797 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285, for which True Return is entitled to enhanced damages.

96.     **Induced Infringement.** Defendant actively, knowingly, and intentionally has been and continues to induce infringement of the '797 Patent, literally or by the doctrine of equivalents, by selling Exemplary Defendant Products to its customers for use in end- user products in a manner that infringes one or more claims of the '797 Patent.

97.     **Contributory Infringement.** Defendant actively, knowingly, and intentionally has been and continues materially contribute to their own customers' infringement of the '797 Patent,

literally or by the doctrine of equivalents, by selling Exemplary Defendant Products to their customers for use in end-user products in a manner that infringes one or more claims of the '797 Patent. Moreover, the Exemplary Defendant Products are not a staple article of commerce suitable for substantial non-infringing use.

98.     Exhibit 11 includes charts comparing the Exemplary '797 Patent Claims to the Exemplary Defendant Products. As set forth in these charts, the Exemplary Defendant Products practice the technology claimed by the '797 Patent. Accordingly, the Exemplary Defendant Products incorporated in these charts satisfy all elements of the Exemplary '797 Patent Claims.

99.     True Return therefore incorporates by reference in its allegations herein the claim charts of Exhibit 11.

100.    True Return is entitled to recover damages adequate to compensate for Defendant's infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendant, together with interest and costs as fixed by the Court.

## JURY DEMAND

101.    Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, True Return respectfully prays for judgment as follows:

A.      a judgment in favor of True Return that MakerDAO has infringed, literally or under the doctrine of equivalents, U.S. Patent No. 10,025,797;

B.      a judgment and order finding that MakerDAO's infringement has been willful;

C.      a judgment and order requiring MakerDAO to pay True Return its damages, costs, expenses, prejudgment interest, post-judgment interest, and enhanced damages for

MakerDAO's infringement, and to provide an accounting of ongoing post-judgment infringement;

D.      a judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding True Return its reasonable attorneys' fees against MakerDAO;

E.      an order preliminarily enjoining MakerDAO from making, using, selling, or offering for sale the claimed subject matter of U.S. Patent No. 10,025,797;

F.      an order permanently enjoining MakerDAO from making, using, selling, or offering for sale the claimed subject matter of U.S. Patent No. 10,025,797, or such other equitable relief the Court deems warranted; and

G.      any and all other relief any and all other relief as the Court may deem appropriate and just under the circumstances.


Dated: October 5, 2022                          Respectfully submitted,

                                                By: _____

                                                David A. Boag
                                                BOAG LAW, PLLC
                                                447 Broadway, Suite 2-270
                                                New York, NY 10013
                                                (212) 203-6651
                                                dab@boagip.com

                                                Attorneys for Plaintiff True Return Systems LLC