**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

TRUE RETURN SYSTEMS LLC,

                          Plaintiff,

v.                                                              Case No. 1-22-cv-8478-VSB

MAKERDAO,

                          Defendant.

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR A DEFAULT JUDGMENT**

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ................................................................................................................. ii

TABLE OF AUTHORITIES ........................................................................................................ iii

PRELIMINARY STATEMENT .................................................................................................... 1

JURISDICTION AND VENUE ..................................................................................................... 1

FACTUAL BACKGROUND .......................................................................................................... 3

    I.      True Return's '797 Patent and Its Regulated Market Origins ............................... 3

    II.    Defendant's Financial Services Business is Functionally a General Partnership ... 4

    III.   Defendant Has Infringed the '797 Patent ................................................................. 6

    IV.   Prevailing Reasonable Royalty Data Supports a 0.1% Annual Royalty ................. 8

    V.    Defendant Was Aware of the Infringement ........................................................... 10

ARGUMENT ................................................................................................................................ 12

    I.      A Default Judgment Against Defendant is Warranted ......................................... 12

    II.    Plaintiff Is Entitled to Permanent Injunctive Relief ............................................. 14

          A.    Plaintiff Has and Will Continue to Suffer Irreparable Harm ........................... 14

          B.    Plaintiff's Remedies at Law Are Inadequate .................................................... 15

          C.    The Balance of Hardships Tips in True Return's Favor .................................... 16

          D.    The Public Interest Demands Permanent Injunctive Relief .............................. 17

    III.   Plaintiff Is Entitled to Damages in an Amount of $17,808,531 ........................... 18

          A.    True Return's Damages as a Result of Defendant's Infringement ................... 18

          B.    Defendant's Willful Infringement Merits an Award of Treble Damages ......... 19

          C.    The Available Damages Data Obviates the Need for a Further Hearing .......... 22

CONCLUSION ............................................................................................................................. 23

## <u>TABLE OF AUTHORITIES</u>

***Cases***

*Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found. Contrs. Inc.*, 699 F.3d 230 (2d Cir. 2012). ............................................................................................ 12

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)............................................................ 14

*Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648 (1983) ............................................................ 19

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970) ................. 19

*Glaxo Group Ltd. v. Apotex, Inc.*, 64 Fed. Appx. 751 (Fed. Cir. Apr. 22, 2003) ........................ 16

*Global Van Lines, Inc. v. Global Moving Express, Inc.*, No. 06 Civ. 3776, 2007 WL 7769395 (S.D.N.Y. Aug. 20, 2007)......................................................................................... 13

*Hutzler Mfg. Co. v Bradshaw Int'l, Inc.*, No. 11 Civ. 7211, 2012 WL 3031150, (S.D.N.Y. July 25, 2012)............................................................................................ 16

*i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831 (Fed. Cir. 2010 ............................................... 14

*Jacobson v. Cox Paving Co.*, 19 U.S.P.Q. (BNA) 1641 (D. Ariz. 1991) .................................... 15

*Jurgens v. CBK, Ltd.*, 80 F.3d 1566 (Fed. Cir. 1996)................................................................... 20

*Keystone Glob. LLC v. Auto Essentials Inc.*, No. 12 Civ. 9077, 2014 WL 4897104 (S.D.N.Y. Oct. 1, 2014)............................................................................................... 22

*Krevat v. Burgers to Go, Inc.*, No. 13 Civ. 6258, 2014 U.S. Dist. LEXIS 131256 (E.D.N.Y. Aug. 5, 2014)................................................................................................ 17

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) ....................................... 20

*Mathis v. Spears*, 857 F.2d 749 (Fed. Cir. 1988).......................................................................... 19

*Pearson Educ., Inc. v. Vergara*, No. 09 Civ. 6832, 2010 WL 3744033 (S.D.N.Y. Sept. 27, 2010) ............................................................................................................................. 16

*Pfizer, Inc. v. Teva Pharms., USA*, 429 F.3d 1364  (Fed. Cir. 2005).................................... 16, 17

*Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992)........................................................... 20

*Sanofi Synthelabo v. Apotex, Inc.*, 470 F.3d 1368 (Fed. Cir. 2006)............................................. 17

*SEB S.A. v. Montgomery Ward & Co., Inc.*, 77 F. Supp. 2d 399 (S.D.N.Y. 1999). .................... 16

*SEC v. Boock*, No. 09 Civ. 08261, 2011 U.S. Dist. LEXIS 158797 (S.D.N.Y. May 10, 2011) ... 22

*Yarway Corp. v. Eur-Control USA, Inc.*, 775 F.2d 268 (Fed. Cir. 1985) ..................................... 20

*Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566 (Fed. Cir. 1996) ............................................ 22

*Sexy Hair Concepts, LLC v. Sexy Hair Inc.*, No. 12 Civ 3937, 2013 U.S. Dist. LEXIS 142361 (E.D.N.Y. Sept. 11, 2013). ................................................................................. 16

*Smithkline Diagnostics. Inc. v. Helena Labs. Corp.*, 926 F.2d 1161 (Fed. Cir. 1991). ............... 19

*Sola Franchise  Corp. v. Solo Salon Studios Inc.*, No. 14 Civ. 0946, 2015 U.S. Dist. LEXIS 38490 (E.D.N.Y. Feb. 9, 2015), ........................................................................... 16

*Stark Carpet Corp. v. Stark Carpet & Flooring Installations, Corp.*, 954 F. Supp. 2d 145 (E.D.N.Y. 2013). ........................................................................................... 15

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling U.S., Inc.*, 699 F.3d 1340, (Fed. Cir. 2012) ............................................................................. 9, 18, 19

*Upjohn Co. v. Medtron Labs, Inc.*, 751 F. Supp. 416, 430 (S.D.N.Y. 1990) .............................. 16

*Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*, 339 F.3d 101 (2d Cir. 2003)...... 14

*Yarway Corp. v. Eur-Control USA, Inc.*, 775 F.2d 268 (Fed. Cir. 1985) .................................... 20

### Statutes

28 U.S.C. § 1391(b). ...................................................................................................... 2

28 U.S.C. § 1400(b) ....................................................................................................... 2

28 U.S.C. § 1961 ........................................................................................................... 19

35 U.S.C. § 271(a) .......................................................................................................... 8

35 U.S.C. § 284 ......................................................................................................... 18, 20

Fed. R. Civ. P. 55(b)(2).................................................................................................... 1

Local Rule 55.2(b) .......................................................................................................... 1

## PRELIMINARY STATEMENT

True Return Systems, LLC ("True Return" or "Plaintiff") by and through its undersigned counsel, respectfully submits this Memorandum of Law in Support of its Motion for a Default Judgment against Defendant MakerDAO pursuant to Fed. R. Civ. P. 55(b)(2), Local Rule 55.2(b), and this Courts' Individual Practices for the causes set forth in the Complaint (ECF No. 1).

On October 5, 2022, True Return brought this action for patent infringement under the Patent Act, 35 U.S.C. § 1 *et seq*. Despite True Return's repeated efforts to engage Defendant, Defendants have failed to appear. Nonetheless, as detailed below, it is apparent that the Defendant and parties closely related to the Defendant have full notice of this action, their default, and are willfully ignoring their obligation to appear. As detailed below, Defendant's confidence to disregard this action appears to come from an erroneous belief that clever structuring of the organization puts it beyond the reach of this Court. It does not.

True Return therefore requests that the Court issue a default judgment against the Defendant, including a permanent injunction prohibiting the Defendants from any further infringement of Plaintiff's U.S. Patent No. 10,025,797 (the "'797 Patent"). Additionally, because of Defendant's willful infringement and bad faith actions, True Return seeks damages in the amount of $17,808,531 inclusive of: (a) $12,398,368 in lost economics; (b) $5,133,745 reflecting enhanced damages for the period July 2022 through November 2022; and (c) pre-judgment interest of $276,418.

## JURISDICTION AND VENUE

Plaintiff brought this action pursuant to the Patent Act, which provides the federal courts with subject matter jurisdiction over patent matters. *See* Compl., ¶¶ 11-12; 35 U.S.C. § 101, et seq.; 28 U.S.C. § 1331.

This Court has personal jurisdiction over Defendant because: (1) Defendant has purposefully availed itself of the privileges of conducting business in the State of New York and in this district; (2) Defendant has sought protection and benefit from the laws of the State of New York; (3) Defendant regularly conducts business within the State of New York and within this district, and Plaintiff's cause of action arises directly from Defendant's business contacts and other activities in the State of New York and in this district. *See* Compl., ¶¶ 11-16.

For example, in late 2022, the Defendant ratified and executed a cryptocurrency exchange transaction worth approximately $500 million with New York-based cryptocurrency firm Gemini, where Gemini's organization as a U.S. company located in New York City and regulated by the New York Department of Financial Services is stated in support of the transaction. Boag Decl., ¶ 7, Exh. D.

As another example, Defendant's Terms of Use invoke the protection of New York State law, stating "[f]or any dispute not subject to arbitration you and MakerDAO agree to submit to the personal and exclusive jurisdiction of and venue in the federal and state courts located in New York, New York." Boag Decl., ¶ 4, Exh. A.

Further, Defendant's ownership and governance token, the MKR token, is one of approximately 115 tokens (out of a token universe generally estimated to exceed 21,000) which has been approved for use by the New York Department of Financial Services ("NYDFS"). Boag Decl., ¶¶ 5-6, Exh. B-C.

Venue is proper in this District under 28 U.S.C. § 1400(b), because Defendant has committed acts of patent infringement in this District. In addition, Plaintiff has suffered harm in this District. *See* Complaint ¶ 16. Alternatively, venue is proper in this District under 28 U.S.C. § 1391(b).

Defendants have purposefully availed themselves of the privilege of conducting business within this judicial district and have established sufficient minimum contacts within this judicial district, and as such, they should be responsive to the Court. Further, MakerDAO has purposefully directed its business at residents and regulators of this judicial district, and at least a portion of the patent infringement claims alleged herein arise out of one or more of the foregoing activities.

## FACTUAL BACKGROUND

### I. True Return's '797 Patent and Its Regulated Market Origins

The '797 Patent, titled, "Method and System for Separating Storage and Process of a Computerized Ledger for Improved Function," is generally directed to systems and methods that improve distributed-ledger technology by addressing computational, time, storage, and security constraints inherent to distributed ledgers (such as blockchains). Compl., ¶¶ 22-23. The general approach of the '797 Patent is to separate certain processing and storage functions from a base distributed computerized ledger (such as a blockchain) but link such separated processing and storage to the base distributed computerized ledger. *Id*. The '797 Patent issued on July 18, 2018. Compl., ¶ 22; Boag Decl.

True Return is the assignee of all right, title, and interest in the '797 Patent including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant times against infringers of the '797 Patent. Compl., ¶ 30. The '797 Patent is an extension of the computer science work inventor Jack Fonss began at the company AccuShares, LLC in 2015.[1]

---

[1] Mr. Fonss co-founded AccuShares in 2013, and Mr. Fonss was its CEO. AccuShares reported to the Commodity Futures Trading Commission (CFTC) as a commodities pool operator, and AccuShares was a U.S. Securities and Exchange Commission (SEC) registrant with four publicly traded listings on the Nasdaq prior to the closing of AccuShares in late 2016. AccuShares was founded to create blockchain-like disintermediation and peer-to-peer-like results in widely

Beginning in 2015, Mr. Fonss began discussions with several larger institutions including the Nasdaq and Digital Asset Holdings to extend its technology and public listings to a hybrid public exchange/blockchain arrangement. As invented several years later, '797 Patent's data management extensions, addressed several technical challenges including one pre-invention long-felt need summarized in Mr. Fonss' 2015 LinkedIn post "What Blockchain and Ledger Technology Can Do for Exchange Traded Products." Boag Decl., ¶ 10, Exh. G.

## II.    Defendant's Financial Services Business is Functionally a General Partnership

MakerDAO operates a cryptocurrency financial services business through its website and on the Ethereum blockchain network. Compl., ¶¶ 6-10. MakerDAO's primary financial service activity involves the issuance of its own U.S. dollar linked algorithmic stablecoin called "Dai." *Id.* Dai is the primary means of exchange into and out of the MakerDAO platform, and Dai is used as a fractional reserve currency for MakerDAO's cryptocurrency lending business. *Id.* MakerDAO business operations effectively combine the activities of a central bank with those of a conventional securities market broker-dealer. Compl., ¶ 9.

MakerDAO operates as a decentralized autonomous organization (a "DAO"), and it is not formally organized as a corporation, LLC, partnership, or other recognized organization type which would serve to limit the liability of its MKR token owners. *Id.*

Generally, MakerDAO's ownership and governance, through the MKR governance token, enables MakerDAO owners to make proposals, vote on proposals, and profit from the activities and operations of MakerDAO and its technology. Compl., ¶ 36.

---

tracked indices with its instruments trading on regulated national exchanges. Over its life, AccuShares raised approximately $11 million in share capital for the company and approximately $10 million in initial (or seed) capital for its funds, and AccuShares' funds are estimated to have transacted between $50 and $150 million in share capital, and Mr. Fonss, through True Returns, has continued to contract with and engage institutional prospects and partners

Defendant MakerDAO has failed to properly answer or otherwise appear in this action. As a possible end-run attempt to this Court and these proceedings, a MakerDAO core unit published the "DAIF [Dai Foundation] CU Update Q4 2022" report to the MakerDAO Forum that stated:

> A legal complaint against MakerDAO has been brought forward to a US court. The lawyer of the plaintiff has attempted to serve the court order in the same way CFTC went about in its complaint against Ooki DAO posting the complaint on discussion forums etc. . . . Therefore, we follow the case closely, discuss it with legal experts & industry partners, and offer support to DeFi industry organizations that are ready to engage.

Boag Decl., ¶ 27, Exh. X. *See also* ECF No. 19, Letter from Counsel for Plaintiff, suggesting that, consistent with its positions on regulation and federal tax compliance (Boag Decl., ¶ 13, Exh. J), Defendant may have arranged to mount a defense by proxy to obviate the need to appear before this Court.

Defendants continue to operate in concert, engaging in collective action for the purpose of the organization. On May 23, 2022, the MakerDAO community publicly ratified a MakerDAO annual expenditure of $720,000 for "Strategic Happiness" and $50,000 for "Swag." Boag Decl., ¶ 11, Exh. H. In the MakerDAO Forum's publicly posted and ratified Strategic Happiness proposal (posted as "*MIP40c3-SP67: Modify Core Unit Budget - Strategic Happiness (SH-001)*"), Strategic Happiness is described as ". . . making people happy and creating a community by Shitposting and sending Airdrops," and "promot[ing] community engagement and promot[ing] the Maker brand by strategically spreading happiness, positive vibes, and mild but delightful confusion throughout the Maker Community via memes, shitposts, and Bespoke Happiness Airdrops." Boag Decl., ¶ 12, Exh. I.

Further, during the period of infringement, Defendant's governance team was publicly debating MakerDAO's lack of compliance with U.S. federal taxes, and schemes to frustrate

compliance. as demonstrated in the public MakerDAO Forum posting titled "*The DAO needs a serious discussion about legal structure*."[2]. Boag Decl., ¶ 13, Exh. J (emphasis added).

## III.    Defendant Has Infringed the '797 Patent

Defendant MakerDAO has used the technology described in the '797 Patent, in its DAI token system through the systems, processes, and software related to market data retrieval, market data storage and processing, and the integration of market data to on-chain transaction records, including MakerDAO's "Oracles V2" and related components.

A primary objective of MakerDAO is the creation, sale, and distribution of the DAI (or "Dai") token. Compl., ¶ 6. MakerDAO promotes DAI as a "stablecoin" where 1 DAI is always targeted to equal 1 U.S. dollar. Compl., ¶¶ 43-44.  MakerDAO's distribution and sale of the DAI token is limited to the amount of collateral acquired by MakerDAO, and MakerDAO's ability to use the '797 Patent infringing system processes and components, including Oracles V2 and other related infringing technologies, to price and value collateral real-time. Compl., ¶¶ 43, 47 For the month February 2022, MakerDAO reported an outstanding DAI amount exceeding $9 billion. Compl., ¶ 37.

The Defendant's public disclosures report that virtually all the growth in MakerDAO's DAI product is based on and reliant upon the simultaneously (or "alongside") launch of MakerDAO's Multi-Collateral Dai (MCD) program and the infringing MakerDAO's Oracles V2.

---

[2] The posting states: "Our major problem isn't securities regulators. We have cash for fines and even a draconian enforcement action then tells us what we need to remedy. Our problem is mainly that of liability and taxation. Maker in the US will almost assuredly be seen as a general partnership. I have yet to hear a lawyer say It would not be.", and "So we need a shield around all our members — not only those who live in or have seizable [sic] assets in the US. We also need to definitively establish jurisdiction for Maker to live in so we don't suddenly find not just the US, but multiple countries claiming Maker owes taxes on the same income." *Id.*

Compl., ¶¶ 7, 79-81. In its "*Introducing Oracles V2 and DeFi Feeds*" post of September 3, 2019, MakerDAO writes: ". . . the Maker Foundation introduced The Road to Multi-Collateral Dai (MCD) Roadmap, which lists the critical milestones that must be achieved before MCD goes live. One milestone is the ratification of a set of governance proposals related to Oracles" and "Today, *the Maker Foundation is proud to announce the next generation of decentralized Oracles, Oracles V2*. Utilizing the lessons learned over the past two years, *Oracles V2 was built from the ground up to optimize for scalability, decentralization, resiliency, latency, and cost.*" Compl., ¶ 78, Exh. 8 (emphasis added).

Also relating to the critical importance of Oracles V2, in the undated MakerDAO Whitepaper "*The Maker Protocol: MakerDAO's Multi-Collateral Dai (MCD) System*," MakerDAO writes: "The Maker Protocol requires real-time information about the market price of the collateral assets in Maker Vaults in order to know when to trigger Liquidations.," and "To protect the system from an attacker attempting to gain control of a majority of the Oracles, the Maker Protocol receives price inputs through the Oracle Security Module (OSM), not from the Oracles directly." Compl., ¶ 41, Exh. 2.

On information and belief, MakerDAO converted its oracles system and processes from "Oracles v1" to "Oracles v2" between late 2019 and early 2020. Compl., ¶ 7. In a February 27, 2020, MakerDAO forum post titled "Scientific Governance and Risk – Thursday, February 27 9AM PST," MakerDAO contrasted Oracles v1 with Oracles v2. A primary Oracles v1 shortcoming is described as: "From a computational/operational point of view, the Oracle v1 is wasteful as every feed needs to make an on-chain transaction with every update to the Medianizer." *Id*. Oracles v2 is highlighted as having differences and benefits which include: "Oracles v2 was released alongside MCD. It addresses some of the problems of scalability, liability, and cost. . . . One major

difference between Oracle V2 and Oracle V1 is that a lot of the process has been moved off-chain." *Id.*

Section 271(a) of the Patent Act states, "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a). To literally infringe a patent, an accused product must practice every limitation of an asserted patent claim. *Kahn v. Gen. Motors Corp.*, 135 F.3d 1472, 1477 (Fed. Cir. 1998). As set forth in the Complaint, and shown in the Claim Charts, Defendants' DAI creation and the processes, methods, and technology, including its implementation of Oracle V2, meets every limitation of independent claim 1 of the '797 Patent. (Compl., Exh. 11, Claim Charts, pp. 1-14). Also as set forth in the Complaint, and shown in the claim charts included therein, Defendants' DAI creation and management system, including its implementation of Oracle V2 and its related system components, meets every limitation of independent claim 7 of the '797 Patent. Compl., Exh. 11, Claim Charts, pp. 15-22.

As set forth in the Complaint, each Claim Chart is based on primary source material published by MakerDAO, with limited standard terminology content from the technical documents of the Ethereum blockchain's formal governing body (Ethereum.org)—the blockchain on which MakerDAO operates. Compl. Exh. 11, Claim Charts, pp. 13-14, 21-22.

## IV. Prevailing Reasonable Royalty Data Supports a 0.1% Annual Royalty

Defendant's manner of operation makes it impossible for True Return to compete as a product distributor or technical systems contractor. At the time of '797 Patent invention, True Return did not anticipate a competitor such as the Defendant which, as a matter of governance and operation, would practice the '797 Patent beyond the reach of this Court, and as self-described, currently outside the reach of regulators and federal tax authorities. Boag Decl., ¶ 13, Exh. J.

Through November 30, 2022, Defendant's income has been derived from the creation, sale, and management of the DAI token. Boag Decl., ¶ 14, Exh. K. MakerDAO reports its income across three categories: "interest income," "trading income," and "liquidation income." *Id*. Over the period June 2020 through November 2022, tracked monthly, DAI outstanding amounts ranged from approximately $127 million to approximately $9.36 billion. Boag Decl., ¶ 15, Exh. L. Over the same period, MakerDAO's aggregate self-reported income was approximately $199 million. Boag Decl., ¶ 14, Exh. K. June 2020 is selected as the measurement period for infringement because it is approximately three-to-six months after Defendant's self-reported implementation of Oracles V2. Compl., ¶¶ 7, 78-80. Table Three of the Statement of Damages summarizes Defendant's publicly published financials over the 2.5-year period. Boag Decl., ¶ 14, Exh. K; Plaintiff's Statement of Damages.

Damages for patent infringement must be "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. The patent owner bears the burden of proving damages. *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling U.S., Inc.*, 699 F.3d 1340, 1357 (Fed. Cir. 2012). Two categories of damages available to the patent owner are its lost profits and "the reasonable royalty that it would have received through arms-length negotiation." *Id*. "The [reasonable] royalty may be based upon an established royalty, if there is one, or if not, upon the supposed result of hypothetical negotiations between the plaintiff and defendant." *Id*. (citation omitted). The hypothetical negotiation seeks to establish the license terms as the parties would have agreed when infringement began. *Id*.

Independent sources for software and technology related patents generally describe an average or median royalty rate of approximately 5% of realized sales or revenue amounts, which generally results in 15% to 25% of profit or earnings as illustrated below.

Below is a table summarizing exemplary independent sources for royalty figures:

| Source | Royalty Rate |
|---|---|
| The Licensing Executives Society (2021)<br><br>(Boag Decl., ¶ 16, Exh. M) | "The average royalty and median rates are 4.82% and 4.75%, respectively, according to the data from the 2021 Survey. Across the four surveys since 2011, the average rate is 5.66%, while the median rate remains at 5%." |
| inQuartik Patent Data (2021)<br><br>(Boag Decl., ¶ 17, Exh. N) | "Royalty rates differ with each industry with no set standard. Rates can range from 0.1% to 8% of the net sales for most patent licensing agreements, depending on the product or industry. Sometimes the rate may reach 25%! High-margin products, such as jewelry or software, normally have higher rates around 6% ∼ 8%, whereas mass-produced products, such as food or household items will have lower rates around 2% ∼ 4%." |
| UpCounsel Technologies, Inc. (2020)<br><br>(Boag Decl., ¶ 18, Exh. O) | "Patent licensing royalty rates are a percentage of the gross or net profit made on each sale of a product.," and<br><br>"Examples of average royalty rates by industry are as follows: . . . Software 9.6 percent" |
| Barnea Jaffa Lande & Co., "How Much Is Your Invention Worth or How Much Should You Pay to License Inventions," JDSupra.com<br><br>(Boag Decl., ¶ 20, Exh. Q) | "Therefore, under the 25 percent rule, in industries where the average operating profit is about 12% (such as the chemicals industry), the average royalty rate is about 3%. In an industry where the average operating profit is about 18.5% (such as the medical products industry), the average royalty rate is about 4.5%. Finally, where the average operating profit in a certain industry is about 26% (such as the pharmaceutical industry), the average royalty rate is about 6.5%." |

Plaintiff respectfully requests an award of 0.1% per annum as measured by DAI token amounts outstanding, which is approximately 6% of earnings, despite the general observation that software and software system patent royalties usually exceed other royalty types.

## V.    Defendant Was Aware of the Infringement

Defendant has been aware of True Return and its patent claim, the '797 Patent, and later the Complaint. *See* ECF No. 10 "Attempts at Service and Awareness." On October 12, 2022,

counsel for Plaintiff provided copies of the Summons, Complaint, and supporting materials, and a letter requesting waiver of service to MakerDAO via the MakerDAO Forum. ECF No. 11, Nov. 11, 2022 Boag Decl., ¶ 10, Exh. G. The MakerDAO forum posting "Infringement complaint filed against MakerDAO" has since been viewed more than 225 times. ECF No. 11, Nov. 11, 2022 Boag Decl., ¶ 11.

Also on October 12, 2022, counsel for Plaintiff provided copies of the summons, complaint, supporting materials and a letter requesting waiver of service via both Twitter (sent directly to @MakerDAO via Twitter direct message) and email (sent directly to the MakerDAO at support@makerdao.com). ECF No. 11, Nov. 11, 2022 Boag Decl., ¶¶ 12-13, Exhs. H-I. Following October 12, 2022, Plaintiff was also engaged via email and a physical mailing (ECF Nos. 24-25).

In an earlier attempt to resolve the dispute without litigation, Counsel for Plaintiff on July 13, 2022, posted a letter and pre-filing copy of a complaint to the MakerDAO Forum. Boag Decl., ¶ 21, Exh. R. The post, titled "Infringement of TRS's U.S. Patent No. 10,025,797 by MakerDAO," was viewed 1,100 times and 11 replies as of this filing. *Id*. Also on July 13, 2022. Counsel for Plaintiff posted the same content to Defendant's Twitter account (@MakerDAO). Decl., ¶ 22, Exh. S.

In addition to the direct views and responses to the July 2022 postings, on August 9, 2022, Søren Peter Nielsen, MakerDAO's head of product (posting under the "sorenpeter" username) published a public document on the MakerDAO Forum titled "Dai Foundation position on Patent infringement complaints against MakerDAO" in which he specifically references Plaintiff's U.S. Patent No. 10,025,797. Boag Decl., ¶ 23, Exh. T.

-11-

In an even earlier attempt to resolve the dispute without litigation, Plaintiff on March 10, 2022, posted a notice letter, draft complaint, and supporting details including the related patent and claims charts to Defendant via Twitter. Boag Decl., ¶ 24, Exh. U. The March 10, 2022 posting on Twitter has more than 7,250 impressions, and 150 engagements at the time of this filing. *Id*.

Also on March 10, 2022, in tandem with the Twitter posting, Plaintiff delivered a detailed notice of its claim with supporting details, including the related patent and claim charts to Defendant to affect a commercial agreement over the patent matter. Boag Decl., ¶ 25, Exh. V. The March 10, 2022 MakerDAO Forum posting has 1,200 views and 8 replies from MakerDAO administrators and users at the time of this filing. *Id*.

More recently, on December 15, 2022, Counsel for Plaintiff received an email from Payam Samarghandi, Board Member of the Dai Foundation, where Mr. Samarghandi requests a delay in the proceedings so he can better organize outside parties and their coordination of an amicus brief.[3]

## **ARGUMENT**

## I.     **A Default Judgment Against Defendant is Warranted**

Pursuant to Fed. R. Civ. P. 55(b), after the Clerk of the Court issues a certificate of default against a party, the court may enter default judgment. "[A] party's default is deemed to constitute a concession of all well pleaded allegations of liability . . . ." *Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found. Contrs. Inc.*, 699 F.3d 230, 234 (2d Cir. 2012). When a court considers a motion to enter default judgment, "plaintiff is entitled to all reasonable inferences

---

[3] Mr. Samarghandi writes: "I am referring to the case No. 22-cv-8478 (S.D.N.Y filed Oct 5, 2022), True Return Systems, LLC v. MakerDAO. In relation to the case, I have been contacted by a group of individuals, who has an interest in the case, and who is considering to file [sic] an amicus brief. Given the complexity of the case and in order to ensure sufficient time to prepare the amicus brief, I kindly ask you to approve a 60 days [sic] extension of the deadline. I kindly also ask you to disclose the e-mail to the court prior to the expiration of the deadline." Boag Decl., ¶ 19, Exh. P.

from the evidence presented." *Global Van Lines, Inc. v. Global Moving Express, Inc.*, No. 06 Civ. 3776, 2007 WL 7769395 (S.D.N.Y. Aug. 20, 2007).

Liability for patent infringement is established when a defendant "without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent." 35 U.S.C. § 271. Preliminarily, the Complaint explains that True Return is the assignee of all right, title, and interest in the '797 Patent including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant times against infringers of the '797 Patent. Compl., ¶ 30.

Additionally, the Complaint describes that MakerDAO infringes one or more claims of the '797 Patent in accordance with 35 U.S.C. § 271(a) by meeting the limitations of at least one or more claims of the '797 Patent in at least this District by making, using, offering to sell, selling and/or importing, without limitation, at least the systems, methods, and products "identified in the charts incorporated into this Count below (among the "Exemplary Defendant Products") that infringe at least the exemplary claims of the '797 Patent also identified in the charts incorporated into this Count below (the "Exemplary '797 Patent Claims") literally or by the doctrine of equivalents." Compl., ¶ 90, ECF No. 1, Exh. 11, Claim Charts.

Without the assistance of a default judgment, Defendant is expected to continue to benefit from this infringement, adversely impacting True Return's ability to compete, and causing significant economic damage to plaintiff. Defendant has exhibited a pattern of disregard for legal compliance. Defendant's governance apparatus publicly debated any need for MakerDAO to comply with regulators and federal tax authorities. A selection of comments on MakerDAO's (incorrect) belief that it is beyond the reach of the legal and regulatory system:

- Our major problem isn't securities regulators. We have cash for fines and even a draconian enforcement action then tells us what we need to remedy.

-13-

- Our problem is mainly that of liability and taxation. Maker in the US will almost assuredly be seen as a general partnership. I have yet to hear a lawyer say It would not be.

- Given the current political climate in the US, desire to increase spending, and growing worry over how to pay for that, I cannot foresee Maker – which pays taxes exactly nowhere – escaping notice, perhaps in multiple jurisdictions at once.

- But in the US, the current level of exposure to legal and tax liability is off the charts due to the size, complexity, and sheer number of members in MakerDAO

- So we need a shield around all our members — not only those who live in or have seizable [sic] assets in the US. We also need to definitively establish jurisdiction for Maker to live in so we don't suddenly find not just the US, but multiple countries claiming Maker owes taxes on the same income.

*See* Boag Decl., ¶ 13, Exh. J.

## II.     Plaintiff Is Entitled to Permanent Injunctive Relief

The Court may "grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. To attain relief, the plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law . . . are inadequate to compensate for the injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861 (Fed. Cir. 2010). Each of these elements is readily met.

### A.     Plaintiff Has and Will Continue to Suffer Irreparable Harm

Irreparable harm is a "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*, 339 F.3d 101, 113 (2d Cir. 2003). Here, True Return will suffer irreparable harm if Defendants are not

permanently enjoined. First, Defendant has adopted an organization form, which based on its own public disclosures, makes it indifferent to the requirements of federal regulators and federal tax authorities (Boag Decl., ¶ 13, Exh. J.), effectively precluding the ability of True Return to complete lawfully. True Return has a valid expectation of exclusivity and cannot compete with competitors who are organized for purposes which include disregard of regulation and tax compliance on its own invention. Further, if Defendants are not enjoined, other potential competitors employing similar regulatory evading organizational forms will be encouraged to deploy and distribute "knock-off" systems. *See Jacobson v. Cox Paving Co.*, 19 U.S.P.Q. (BNA) 1641, 1653 (D. Ariz. 1991) (influencing existing or potential infringers to back off is a factor weighing in favor of granting an injunction).

Because True Return faces the prospect of losses that are difficult to measure and to replace, and because such losses are inconsistent with True Return's legal right to exclusively use, sell, and commercially exploit the '797 Patent, money damages are an inadequate remedy and True Return will suffer irreparable injury absent the issuance of a permanent injunction.

**B.**    **Plaintiff's Remedies at Law Are Inadequate**

There is no adequate remedy at law in actions, such as this one, involving unresponsive defendants. "A defendant's refusal to appear in [the] action demonstrates the  inadequacy of plaintiff's remedies at law." *Stark Carpet Corp. v. Stark Carpet & Flooring Installations, Corp.*, 954 F. Supp. 2d 145, 158 (E.D.N.Y. 2013). Defendants provide no assurances against their continued infringing activity so a plaintiff cannot surely and adequately be compensated for its injuries. *Id*. Rather, "the default gives rise to the inference that the Defendant is willing to continue to infringe upon Plaintiffs'" intellectual property rights. *Sola Franchise  Corp. v. Solo Salon Studios Inc.*, No. 14 Civ. 0946, 2015 U.S. Dist. LEXIS 38490, at *40  (E.D.N.Y. Feb. 9, 2015),

Exh. A[4]; *see also Pearson Educ., Inc. v. Vergara*, No. 09 Civ. 6832, 2010 WL 3744033 (S.D.N.Y. Sept. 27, 2010) ("A court may infer from a defendant's default that it is willing to, or may continue its infringement."); *Sexy Hair Concepts, LLC v. Sexy Hair Inc.*, No. 12 Civ. 3937, 2013 U.S. Dist. LEXIS 142361, at *9 (E.D.N.Y. Sept. 11, 2013), Exh. B (same).

Here, there is a clear indication that Defendants are willing to continue to infringe the '797 Patent, absent permanent injunctive relief. Defendants have been completely unresponsive to True Return's communications and have failed to appear before this Court. A permanent injunction is necessary to prevent further infringement of the '797 Patent.

**C.    The Balance of Hardships Tips in True Return's Favor**

The balance of hardships tips in True Return's favor. True Return has invested extensive time, labor, skills, and expenditures in developing its invention. Compl., ¶¶ 17-21. On the other hand, it is well-settled that "[a]n alleged infringer's loss of market share and customer relationships, without more, does not rise to the level necessary to overcome the loss of exclusivity experienced by a patent owner due to infringing conduct." *Pfizer, Inc. v. Teva Pharms., USA*, 429 F.3d 1364, 1382 (Fed. Cir. 2005); *accord Hutzler Mfg. Co. v Bradshaw Int'l, Inc.*, No. 11 Civ. 7211, 2012 WL 3031150, (S.D.N.Y. July 25, 2012); *Upjohn Co. v. Medtron Labs, Inc.*, 751 F. Supp. 416, 430 (S.D.N.Y. 1990); *Glaxo Group Ltd. v. Apotex, Inc.*, 64 Fed. Appx. 751, 756 (Fed. Cir. Apr. 22, 2003); *SEB S.A. v. Montgomery Ward & Co., Inc.*, 77 F. Supp. 2d 399, 405 (S.D.N.Y. 1999).

---

[4] Any cases cited in this Memorandum with a LEXIS citation were not available in any Westlaw reporter and are attached as an exhibit, per the Court's Individual Rules & Practices in Civil Cases.

Additionally, the balance of hardships further tips in True Return's favor as Defendant is in default and unlikely to cease their infringing activity. *See Krevat v. Burgers to Go, Inc.*, No. 13 Civ. 6258, 2014 U.S. Dist. LEXIS 131256, at *26 (E.D.N.Y. Aug. 5, 2014), Exh. C (balance of hardship weighed in the plaintiff's favor when defendant's "failure to . . . participate in this action, even after the entry of default, further demonstrates that it is unlikely to cease its infringing activity"). Thus, a balancing of the parties' respective potential hardships favors True Return.

### D.    The Public Interest Demands Permanent Injunctive Relief

Consideration of the public interest weighs clearly in favor of True Return. No legitimate public interest would be served by Defendants' distribution of infringing products. Indeed, in patent infringement cases, there is a compelling, intrinsic public interest in protecting rights secured by valid patents. *See Pfizer*, 429 F.3d at 1382 (citation and quotation omitted); *Sanofi Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383-84 (Fed. Cir. 2006). The public interest is served, therefore, by granting injunctive relief in favor of True Return and permanently enjoining Defendants. Continuing to permit Defendant infringement may have the effect of encouraging additional infringing parties to organize and operate in a manner similar to the Defendant for the purposes of circumventing this Court and other federal authorities.

Further, as indicated in its own publicly published disclosures, Defendant acknowledges that it has organized in a manner which affords it the ability to compete without regard to regulators or tax authorities, and rather than adopt a plan of compliance, MakerDAO governance suggests a plan to protect its investors and administrators in connection with its disregard of legal authorities: "[to] dedicate resources and make a commitment to proactively protect MKR holders in the US who may otherwise get spooked and dump their tokens, or quit their jobs in Core Units." This leaves in place the ability for MakerDAO to preserve its noncompetitive practices. Boag Decl., ¶ 13, Exh. J.

In response to the recent *Commodity Futures Trading Commission v. Ooki DAO* (3:22-cv-05416), and in the publicly posted governance proposal "MIP84: Activate Protocol-Owned Vault Emulation," MakerDAO governance publicly states that it is not preparing to accommodate lawful crypto regulation and enforcement, but essentially just the opposite. Boag Decl., ¶ 26, Exh. W. In the public posting, MakerDAO founder and governance member "rune" stated:

> Maker have already long ago completed the same steps that Ooki DAO did, but that does not protect us from the trajectory of crypto regulation and enforcement that is in motion following the erasure of crypto goodwill due to Terra, Celsius etc.
>
> * * *
>
> So we have to assume that we have several years available to take the necessary steps and in the medium term prepare to become a real and uncompromised decentralized finance protocol operated by a real and uncompromised decentralized autonomous organization.

*Id*.

## III.     Plaintiff Is Entitled to Damages in an Amount of $17,808,531

### A.     True Return's Damages as a Result of Defendant's Infringement

Damages for patent infringement must be "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. The patent owner bears the burden of proving damages. *See Transocean Offshore Deepwater Drilling, Inc.*, 699 F.3d at 1357. Two categories of damages available to the patent owner are its lost profits and "the reasonable royalty that it would have received through arms-length negotiation." *Id*. "The [reasonable] royalty may be based upon an established royalty, if there is one, or if not, upon the supposed result of hypothetical negotiations between the plaintiff and defendant." *Id*. (citation omitted). The hypothetical negotiation seeks to establish the license terms as the parties would have agreed when infringement began, here, not later than June 1, 2020. *Id*.

-18-

True Return should be awarded the amount of 0.1% on Defendant's DAI outstanding, paid monthly, for the period June 2020 to December 2022—$12,398,368—that it would have negotiated in an arms-length transaction with the Defendants, in line with the factors set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), aff'd 446 F.2d 295 (2d Cir. 1971), and recognized by the Federal Circuit (*Smithkline Diagnostics. Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1168 (Fed. Cir. 1991)).

The '797 Patent provided a technological leap from previous technology (e.g., over Defendant's pre-infringement Oracle V1 referenced herein), which is far less sophisticated and far less capable. *Georgia-Pacific Corp.* 318 F.Supp. at 1120 (ninth and tenth factors are "the utility and advantages of the patent property over the old modes or devices" and "the nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention"). Based on these factors and the hypothetical negotiation model, True Return should be awarded damages totaling the royalty licensing fee that it would have negotiated with Defendants at the start of the infringement— $12,398,368 plus pre-judgment interest.

Absent some justification, prejudgment interest should "be awarded where necessary to afford the plaintiff full compensation for the infringement." *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 654 (1983). True Return should be awarded prejudgment interest, set at $276,418 based on the monthly award amounts and "a rate equal to the weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding the date of the judgment" is also proper here. 28 U.S.C. § 1961; *Mathis v. Spears*, 857 F.2d 749, 761 (Fed. Cir. 1988).

### B.     Defendant's Willful Infringement Merits an Award of Treble Damages

True Return's compensatory damages for the final four-month period July 2022 to December 2022 of $2,566,873 should be trebled because of Defendants' willful infringement and

bad faith conduct. 35 U.S.C. § 284 (a court can enhance damages up to three times); *See Yarway Corp. v. Eur-Control USA, Inc.*, 775 F.2d 268, 277 (Fed. Cir. 1985) ("It is well-settled that enhancement of damages must be premised on willful infringement or bad faith."). "The paramount determination in deciding to grant enhancement and the amount thereof Is the egregiousness of the defendants' conduct based on all the facts and circumstances." *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826 (Fed. Cir. 1992), abrogated on other grounds by *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 975 (Fed. Cir. 1995) (en banc); *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1571 (Fed. Cir. 1996) ("where one continues his infringing activity, and fails to investigate and determine . . . that he possesses reasonable defenses . . . the infringement is in bad faith").

Factors courts consider in deciding whether to enhance damages include: (1) whether the infringer deliberately copied the ideas of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior in the litigation; (4) the defendant's size and financial condition; (5) closeness of the case; (6) duration of defendant's misconduct; (7) remedial action by defendant; (8) defendant's motivation for harm; (9) whether defendant attempted to conceal its misconduct. *Read Corp.*, 970 F.2d at 827.

These factors weigh in favor of an enhancement of True Return's damages. Defendants were well-aware of the Patent by early March 2022 after a counsel letter, draft complaint, and full set of '797 Patent claims charts were published on the MakerDAO Forum on March 10, 2022 – the '797 Patent MakerDAO Forum post titled "MakerDAO's Use of U.S. Patent No. 10,025,797: Method and System for Separating Storage and Process of a Computerized Ledger for Improved Function" reports more than 1,200 views. Boag Decl., ¶ 25, Exh. V. In addition, Plaintiff also

posted the same materials to MakerDAO's Twitter account (@MakerDAO) on March 10, 2022, and that Twitter post reports 7,255 views and 156 engagements. Boag Decl., ¶ 24, Exh. U. Further, there is no evidence that Defendant investigated the scope of the Patent, or that they formed a good faith belief that MakerDAO systems and software, including Oracle V2 and its related components, did not infringe the Patent. MakerDAO has described its infringing activities under "Oracles V2" and its related components as a "milestone", "the next generation," and "[b]uilt from the ground up, "while the detailed Claim Charts (provided to the Defendant almost one year ago), which are based on Defendant's own source documents, indicate infringement based on at least two independent claims.  Compl., ¶ 78, ECF No. 1, Exh. 8, ECF No. 1, Exhibit 11, Claim Charts.

Defendant has failed to respond to engagements with Plaintiff or Counsel for Plaintiff, and Defendant has failed to appear or respond to this Court. (ECF No. 25 Clerk's Certificate of Default). Instead, core unit facilitators for MakerDAO, published the "DAIF CU Update – Q4 2022," where MakerDAO affirmatively states, "A legal complaint against MakerDAO has been brought forward to a US court," but concludes with, "[w]e follow the case closely, discuss it with legal experts & industry partners, and offer support to DeFi industry organizations that are ready to engage," suggesting that, rather than appearing, MakerDAO is relying on industry organizations to possibly engage in a manner to sufficiently delay, disrupt, or frustrate the Court's proceedings and continue infringement. Boag Decl., ¶ 27, Exh. X.

Despite its self-described unregulated and untaxed nature, As of the December 31, 2021, as measured by total assets (or in cryptocurrency terminology "TVL" or total value locked), MakerDAO held approximately $17.6 billion of assets. Boag Decl., ¶ 28, Exh. Y. Measured against the largest U.S. commercial banks, as reported by the U.S. Federal Reserve Bank, MakerDAO's

assets are approximately equal to the 100th largest bank on the list which ranks 2,129 commercial banks operating in the U.S. as of December 31, 2021 report. Boag Decl., ¶ 29, Exh. Z.

**C.      The Available Damages Data Obviates the Need for a Further Hearing**

True Return should be awarded the requested damages without a further hearing because it has provided sufficient basis to ascertain its damages with certainty. All metrics relating to the scale of MakerDAO's infringing activity including the amount and timing of DAI sales, and the amount and timing of self-reporting income for the period June 2020 through November 2022 are used to precisely compute the economic loss. Boag Decl., ¶ 14, Exh. K; Boag Decl. ¶ 15, Exh. L. While a court *may* hold a hearing to assess the amount of damages F.R.C.P. 55(b)(2) leaves the decision of whether a hearing is necessary to the discretion of the district court" *SEC v. Boock*, No. 09 Civ. 08261, 2011 U.S. Dist. LEXIS 158797, at *24 (S.D.N.Y. May 10, 2011), Exh. D (internal citations and quotations omitted). The determination of whether to hold such a hearing rests on whether the moving party has provided "a sufficient basis for the Court to determine damages." *Id.* at *23. A hearing is unnecessary where "the documents before the Court provide a sufficient basis from which to evaluate the fairness" of the disgorgement sought by the of the award and where "[defendant] has submitted nothing in response, nor requested a hearing." *Id*. at *24.

Of pertinence here, "when damages cannot be ascertained with precision because the evidence available from the infringer is inadequate, any doubts must be resolved against the infringer." *Keystone Glob. LLC v. Auto Essentials Inc.*, No. 12 Civ. 9077, 2014 WL 4897104 (S.D.N.Y. Oct. 1, 2014) (citing *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1572 (Fed. Cir. 1996)). The public nature of Defendant's enterprise provides a clear window into its financials and scope of the infringement. Boag Decl., ¶ 14, Exh. K; Boag Decl. ¶ 15, Exh. L. Accordingly, a hearing on damages is not warranted in this instance.

## **<u>CONCLUSION</u>**

For the foregoing reasons, True Return respectfully requests that this Court enter Plaintiff's proposed Default Judgment against the Defendant, enjoining the Defendant in accordance with the terms contained herein. Additionally, True Return respectfully requests that the Court order damages in the amount of $17,808,531 for Defendant's patent infringement, inclusive of $12,398,368 in lost economics, pre-judgment interest thereon of $276,418 (based on a federal applicable rate of the 1-year U.S. treasury rate), and $5,133,745 in enhanced damages for the period July 2022 to December 2022.

Dated: February 14, 2023,                    Respectfully submitted,

BOAG LAW, PLLC

By:

David A. Boag (DB9899)
447 Broadway, Suite 2-270
New York, NY 10013
(212) 203-6651
dab@Boagip.com

*Attorneys for Plaintiff True Return Systems LLC*