**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TRUE RETURN SYSTEMS LLC, | |
| Plaintiff, | |
| v. | Case No. 22-cv-8478-LTS |
| MAKERDAO, | |
| Defendant. | |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT MAKERDAO'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................. 1

II.   FACTUAL BACKGROUND ................................................................................ 2

      A.    MakerDAO's General Partnership.............................................................. 2

      B.    MakerDAO's Availment of New York Laws and Regulations ............................. 3

      C.    MakerDAO's Domestic Operations............................................................. 4

            1.    The Ethereum Blockchain............................................................... 5

      D.    MakerDAO's Enduring and Concentrated Economic Interests............................ 6

      E.    MakerDAO's Major U.S. Capital Markets Business............................................. 7

      F.    MakerDAO Operates Under Joint and Collective Control ..................................... 8

      G.    MakerDAO Does Business and Promotes Itself Under Its Own Name.................. 8

III.  ARGUMENT ......................................................................................................... 9

      A.    Courts Have Already Addressed These Issues in Similar DAO Cases ................. 9

      B.    MakerDAO is a General Partnership Capable of Being Sued ............................ 11

            1.    Joint Management and Control................................................... 12

            2.    Sharing Profits and Losses with Members................................. 13

            3.    Joint Liability to Creditors ........................................................ 14

            4.    Ownership of Partnership Assets ............................................... 15

            5.    Intention of Parties.................................................................... 16

            6.    Compensation ........................................................................... 16

            7.    Contribution of Capital ............................................................. 17

            8.    Loans to the Organization ......................................................... 17

      C.    Token Holders Are Collectively Engaged in a Common Profit Purpose ............ 18

      D.    MakerDAO Operates in the U.S. ......................................................... 19

      E.    Public Policy Considerations .............................................................. 22

IV.   CONCLUSION .................................................................................................. 23

## TABLE OF AUTHORITIES

Cases

*Brodsky v Stadlen*, 138 AD2d 662, 663 (1988). ....................................................................... 12, 13

*Brodsky v. Stadlen*, 138 A.D.2d 662, 663 (N.Y. App. Div. 1988)................................................. 13

*CFTC v. Ooki DAO*, No. 3:22-cv-05416 (N.D. Cal. 2022.................................................... 2, 10, 11

*Community Capital Bank v. Fischer & Yanowitz*, 850 NYS2d 508 (2008) .......................... 12, 13

*Czernicki v. Lawniczak*, 74 A.D.3d 1121 (N.Y. App. Div. 2010) .................................................. 12

*Houghton v. Leshner*, No. 22-cv-07781 (N.D. Cal. Sept. 20, 2023) ......................................... 9, 10

*Loon v. Dep't of Treasury*, No. 23-CV-312-RP (W.D. Tex., Aug. 17, 2023) ............................. 10

*Sarcuni v. bZx DAO*, No. 22-cv-00618 (S.D. Cal. 2022) ....................................................... 10, 11

*VIDIVIXI, LLC v. Grattan*, 155 F. Supp. 3d 476 (S.D.N.Y. 2016) ............................................. 13

## I.      INTRODUCTION

MakerDAO acquires, manages, and generates billions of dollars in U.S.-sourced assets and millions of dollars in U.S. sourced income, much of it in this District. (Boag Decl., Exh. A at pp. 1-7; Exh. P at pp. 5, 7, 14). Its for-profit business enterprise operations notwithstanding, Defendant argues that it is a non-juridical entity outside the reach of U.S. courts—and therefore essentially outside the law—because it deploys its operations as a distributed autonomous organization or "DAO." (Dkt. No. 76, pp.1, 7).

However, Defendant's DAO operations, while complex, are no more than a general partnership in disguise. MakerDAO and its owners (holders of the MKR token) exercise joint management and control, share profits and losses, own assets, and engage in the type of concerted business operations that confer general partnership status under New York law, as detailed below. Indeed, courts around the country faced with similar DAO liability issues have consistently refused to confer the invulnerable status that MakerDAO seeks.

Separately, Defendant's blockchain-based operation is not extraterritorial in nature because it uses the Ethereum blockchain. Ethereum, a popular and widely used blockchain, is not a random distributed system where some-or-all of certain processes might run in one country or another. Rather, Ethereum remains a duplicative system where all nodes of the network (whether located in the U.S. or elsewhere) run every step and process of every transaction regardless of origin. Defendant's infringement in the U.S. by U.S. actors can be shown.

Lastly, as discussed below, MakerDAO is an extremely sophisticated and well-funded technology and finance operation, far from the itinerant transient portrayed in Defendant's motion. At the end of 2021, MakerDAO, measured by total assets, was approximately equal to the 100th largest regulated commercial bank in the U.S. (Dkt. No. 27, p.21 and Dkt. No. 30, Exh. Y, Z).

## II.      FACTUAL BACKGROUND

### A.      MakerDAO's General Partnership

Defendant MakerDAO is a decentralized autonomous organization ("DAO") that operates a cryptocurrency banking business on the Ethereum blockchain. (Dkt. No. 11, Exh. A). Equity in MakerDAO is owned and operated by anonymous and pseudo-anonymous cryptocurrency investors through MakerDAO's "MKR" token. (Dkt. No. 11, Exh. B). The MKR token represents a divisible interest of ownership, giving holders of the token a proportional interest in MakerDAO assets and profits, as well as rights to propose, direct, and vote on MakerDAO governance. *Id.*

MakerDAO is the latest in a line of DAO defendants that have attempted to circumvent liability based on the erroneous claim that a DAO is beyond the law. *See, e.g.*, *Commodity Futures Trading Commission v. Ooki DAO*, No. 22-cv-05416 (N.D. Cal. Dec. 20, 2022) (finding the Ooki DAO to be a "person" under the Commodity Exchange Act and thus liable for violations of the law).

MakerDAO business operations effectively combine the activities of a central bank with those of a conventional securities market broker-dealer. (Compl., ¶ 9). MakerDAO operates a cryptocurrency financial services business through its website and on the Ethereum blockchain network. (Compl., ¶¶ 6-10). MakerDAO's primary financial service activity involves the issuance of its own U.S. dollar linked algorithmic stablecoin called "Dai." *Id.* Dai is the primary means of exchange into and out of the MakerDAO platform, and Dai is used as a fractional reserve currency for MakerDAO's cryptocurrency lending business. *Id.*

MakerDAO's organizational structure is a decentralized autonomous organization ("DAO"). While not *formally* organized as a corporation, LLC, partnership, or other state-sanctioned organization type, it functions in all respects as a general partnership under New York State law.

Governance of Defendant's organization is coordinated through ownership of another crypto token called known as MKR. Ownership of MKR token(s) enables MakerDAO owners to make proposals, vote on proposals, and profit from the activities and operations of MakerDAO and its technology. (Compl., ¶ 36).

Defendant's membership operates in concert, engaging in collective action for the purpose of the organization, in a variety of ways ranging from the very significant to the trivial. For example, on October 10, 2022, Defendant used the MakerDAO Forum to record votes by holders of the MKR token on whether to approve a proposal to post approximately $1.6B of its positions with the centralized cryptocurrency company U.S. headquartered Coinbase, which would enhance MakerDAO's treasury operation profitability. (Dkt. No. 11, Exh. P). On May 23, 2022, the MakerDAO community publicly ratified a MakerDAO annual expenditure of $720,000 for "Strategic Happiness" and $50,000 for "swag." (Dkt. No. 30, Exh. H).[1] These are two of many examples detailed herein where Defendant has marshaled collective agreement for the common (MakerDAO) good. *See also* Dkt. No. 30, Exh. J ("The DAO needs a serious discussion about legal structure," a community post detailing MakerDAO's lack of compliance with U.S. federal taxes, and schemes to frustrate compliance).

**B.     MakerDAO's Availment of New York Laws and Regulations**

MakerDAO has been diligent in availing itself to the protections and benefits of New York laws and MakerDAO conducts business with institutions in this District. (Compl. ¶¶ 14, 15; Dkt. No. 30, Exh. D). MakerDAO's Terms of Use invoke the protection of New York State law, stating

---

[1] The publicly ratified Strategic Happiness proposal describes Strategic Happiness as "promot[ing] community engagement and promot[ing] the Maker brand by strategically spreading happiness, positive vibes, and mild but delightful confusion throughout the Maker Community via memes, shitposts, and Bespoke Happiness Airdrops." (Dkt. No. 30, Exh. I).

"[f]or any dispute not subject to arbitration you and MakerDAO agree to submit to the personal and exclusive jurisdiction of and venue in the federal and state courts located in New York, New York." (Dkt. No. 30, Exh. A). *See also* Dkt. No. 31, p. 2 (describing Defendant's NYS-based operations including: (i) listing its ownership/governance tokens with the New York Department of Financial Services and (ii) executing $500 million dollar transactions with New York regulated financial institutions based on their anticipated New York banking regulatory safeguards).

### C.     MakerDAO's Domestic Operations

MakerDAO has been distributing and using its system and software-based DAI token product *in the U.S.* since at least June 2019 through Coinbase. (Boag Decl., Exh. H). It has been distributing, deploying, and using its methods, software, and systems in the U.S. for at least as long. *Id.*  Plaintiff alleged as much in the Complaint:

> Investment and ownership tokens in MakerDAO are freely tradable in the U.S. on the largest cryptocurrency exchanges including Coinbase, Gemini, and Kraken. Similarly, access to MakerDAO's Dai-based services is available throughout the U.S.

(Compl., ¶ 8). Coinbase, Gemini and Kraken are each headquartered in the U.S. and sell to U.S. clients.

MakerDAO has also distributed, used, and sold the DAI system in the U.S. through its own channels of related companies operating in the U.S., including "Oasis" (a.k.a. Oasis Trade) and "Summer,fi," each operating as MakerDAO's system front ends for the U.S. (Boag Decl., ¶ ¶ B, C).

Similarly, MakerDAO exhibited at a conference in Colorado in 2019 where is distributed it Dai system in person in the U.S.:

> Every attendee will receive their own unique web wallet that will be pre-loaded with a localcoin called buffDai, which is pegged to the Dai, and will be used to drive the ETHDenver economy.

(Boag Decl., Exh. D, p. 2).

As discussed in detail below, MakerDAO's use of the Ethereum blockchain in fact confirms that it operates in the U.S.[2]

### 1.    The Ethereum Blockchain

A blockchain is a decentralized, transparent, and secure way of recording and verifying transactions. Blockchains rely on a network of computers working together to maintain a shared digital ledger, making it resistant to fraud or data loss, and having multiple identical copies of the blockchain exist simultaneously is essential to any blockchain. The Ethereum blockchain used by Defendant is one such example.

Defendant's organization runs on the Ethereum blockchain (Compl., Exh. 2, p. 2), a data structure that comprises a collection of duplicate nodes where all nodes perform duplicate operations. All nodes in the network perform all of Ethereum's transactional operations including smart contract executions. (Boag Decl., Exh. I) ("this data isn't distributed across many nodes, where each node would process different pieces of data but instead replicated across multiple nodes, meaning each node stores and processes the same data."); Exh. J ("***every node in the network has to personally verify every single transaction***"); and Exh. E ("To achieve the level of security, integrity, transparency, and reliability that Ethereum aspires to, every node runs and stores every transaction.")

---

[2] Defendant makes misleading statements and erroneous conclusions regarding "extraterritorial activities" including (i) "MakerDAO operates globally and has no address or locations in the United States. The Complaint fails to plead facts concerning the accused activities that could give rise to a plausible claim for infringement in view of MakerDAO's extraterritorial activities" (Dkt. No. 76, p. 2), and (ii) "The Complaint does not allege any facts to the effect that the Ethereum blockchain on which MakerDAO operates exists in the United States." *Id*. p.31. Plaintiff's Complaint details MakerDAO's operations on the Ethereum blockchain, including the deployment of method software and system relating to "Oracles 1" and "Oracles 2". See, e.g., Complaint ¶¶ 4-7

Analysis of the real-world implementation of the Ethereum blockchain used by Defendant confirms these principles play out in practice. As set forth in the Declaration of Jack Fonss, analysis of publicly available historical Ethereum node location records confirms that the percentage of the total nodes operating in the U.S. has ranged from 27.2% in February 2020 to 45.1% in October 2022 to 38.5% in October 2023. (Fonss Decl., Exh. A). This is real-world evidence that Defendant's operations occur within the U.S.

If the MakerDAO system is used Ethereum for all transactions, it necessarily follows that every Ethereum node in the U.S. (*see Id.*) also performs every MakerDAO transaction.

### D.      MakerDAO's Enduring and Concentrated Economic Interests

MakerDAO produces financials and performance reports for the benefit of its owners. (Compl. ¶ 38). At the end of 2021, MakerDAO, measured by total assets, was approximately equal to the 100th largest regulated commercial bank in the U.S.  (Dkt. No. 27, p.21; Dkt. No. 30, Exhibits Y, Z).

Voting activity and voting results at MakerDAO confirm that its economic partners are concentrated and that the Defendant itself is in no way transient, "a nothing," or otherwise immaterial. Looking at an October 10, 2022 vote, Defendant used the MakerDAO Forum to record votes by holders of the MKR token on whether to approve a proposal to post approximately $1.6B of its positions with the centralized cryptocurrency company U.S. headquartered Coinbase, which would enhance MakerDAO's treasury operation profitability. (Dkt. No. 11, Exh. P). The vote reporting shows a concentration of voting, with the top four voting addresses accounting for more than 57% of the total votes. (Dkt. No. 11, Exh. C).

Defendant also relies on a count of "more than 94,000 unique addresses" to claim that MakerDAO is generally transient. (Dkt. No. 76, p. 11). In reality, MakerDAO's economic and

voting interests are highly concentrated. An examination of the Defendant's "94,000 claim" reveals that that approximately 90% of the holdings are below $500 and a full 75% are approximately $50 or less in value. (Fonss Decl., ¶ 8). In other words, the holdings of the MKR token are highly concentrated among a small group of owners.

E.    **MakerDAO's Major U.S. Capital Markets Business**

MakerDAO has operated throughout the U.S. since at least early 2019 promoting the sale of both its DAI token product and its ownership token MKR. MakerDAO capitalizes on a U.S. customer base, the U.S. Treasury market, and capital markets activities throughout the U.S., at times reaching over $17 billion in portfolio assets, comparable to a commercial bank. (Dkt. No. 27, pp. 21-22).

MakerDAO's U.S. banking assets include cryptocurrencies (e.g. ETH-Ether, BTC-Bitcoin) and a range of so-called RWA or "real world assets" dominated by U.S. based activities. RWAs have included U.S. bank originated mortgages (e.g. Huntingdon Valley Bank a.k.a. First Citizens Community Bank), U.S. commercial property leases/loans (e.g. 6s Capital), and U.S. dollar backed cryptocurrency stablecoins of Gemini, a New York domiciled trust company (e.g. "GUSD"). (Dkt. No. 19, n. 1, and Dkt. No. 31, p. 2).

MakerDAO's considerable RWA operations are run by members in the U.S. (Boag Decl., Exh. L) (noting that MakerDAO's investments in the U.S. may be carried out through a member-managed Delaware LLC (with RWA Foundation as the sole member) or through a Delaware Statutory Trust (with RWA Foundation as the trust sponsor). MakerDAO will lend (or contribute) DAI to the RWA Foundation . . . .").

For more than four years, MakerDAO's Dai and MKR tokens have been sold, held, invested, and voted by partners in the U.S., including investments by a number of U.S. domiciled

investment groups dating back to 2018 and 2019. (Boag Decl., Exh. M). MakerDAO has actively promoted its ownership and investment interests in the United States. (Boag Decl., Exh. N). Dai was available in the U.S. at cryptocurrency brokerage firm Coinbase from at least June 2019 (Boag Decl., Exh. H), and MakerDAO's own blog posting titled "Meridio Integrates Maker's Dai Stablecoin" promotes the purchase of DAI for use in New York real estate transactions. (Boag Decl., Exh. O).

### F.      MakerDAO Operates Under Joint and Collective Control

The MKR token represents a divisible interest of ownership, giving holders of the token a proportional interest in MakerDAO assets and profits, as well as rights to propose, direct, and vote on MakerDAO governance. (Dkt. No. 10, p. 1). Its nontraditional and purported decentralized structure notwithstanding, MakerDAO can summon consensus for the benefit of MKR holders. As one example, on October 10, 2022, Defendant used the MakerDAO Forum to record votes by holders of the MKR token on whether to approve a proposal to post approximately $1.6B of its positions with the centralized U.S. cryptocurrency company Coinbase, which would enhance MakerDAO's treasury operation profitability. (*Id.* at p.2).

MKR holders can vote on an almost unlimited range of business decisions including adding new collateral asset types, modifying the Dai savings rate, even triggering an emergency shutdown. (Dkt. No. 1, Att. 2, p. 15).

### G.      MakerDAO Does Business and Promotes Itself Under Its Own Name

MakerDAO develops and promotes the MakerDAO blockchain environment to individuals and institutions in the U.S. in large part to expand the use and adoption of the MKR token and thereby increase the value of the MKR token. MakerDAO produces financials and performance reports for the benefit of its owners. (Compl. ¶ 38).

Defendant likewise operating in concert, engaging in collective action for the purpose of the organization and promoting the MakerDAO name and brand. (Compl. ¶¶ 37-38). For example, on May 23, 2022, the MakerDAO community publicly ratified a MakerDAO annual expenditure that included and $50,000 for "swag" (Dkt. No. 30, Exh. H).

Perhaps the best example of the MakerDAO brand is its intellectual property surrounding the same. MakerDAO ironically takes full advantage of U.S. laws for its own property, safekeeping its own intellectual property including copyrights, URLs, and the U.S. trademark "MAKERDAO," U.S. Trademark Registration Number 5814538. (Boag Decl., Exh. Y).

## III.   ARGUMENT

### A.   Courts Have Already Addressed These Issues in Similar DAO Cases

Defendant is not the first DAO to argue that through the use of clever structuring and technology, its operations are beyond the reach of any regulation. Courts have recently seen a wave of DAO-based cryptocurrency businesses claiming that they are non-juridical entities for one reason or another. *See, e.g.*, *Houghton v. Leshner*, No. 22-cv-07781 (N.D. Cal. Sept. 20, 2023) (denying a motion to dismiss where plaintiff contended that the individual partners within the Compound DAO partnership may be liable for the acts of the Compound DAO partnership). These arguments have generally been viewed for what they are, i.e., an unsuccessful ploy for defendants and targets of regulatory action to delay, dismiss, and obfuscate. These courts have generally recognized that a duck is a duck and the DAO structure—while once novel and technologically clever—does not shield liability in all forms. *See Commodity Futures Trading Commission v. Ooki DAO3*, No. 22-cv-05416 (N.D. Cal. Dec. 20, 2022) (finding the Ooki DAO to be a "person" under the Commodity Exchange Act and thus liable for violations of the law); *Sarcuni v. bZx DAO*, 22-

cv-00618 (S.D. Cal. Mar. 27, 2023) (finding defendant DAO and its successor to be a general partnership comprising "all persons holding BZRX tokens"); *Loon v. Dep't of Treasury*, No. 23-cv-312 (W.D. Tex. Aug. 17, 2023) (rejecting DAO claim that it was "not an entity but an autonomous software" and finding the same to be "an association within the ordinary meaning of the term . . . .").

In *Houghton*, the Court allowed a Securities Act claim to proceed against "Compound DAO" and a roster of top COMP token holders. *Houghton* at 11. While not deciding the ultimate issue of DAO liability ("[w]hat liability may eventually be assessed against Compound DAO is still to be determined") the Court permitted the claims to proceed. *Houghton* at 9.

In *Sarcuni*, the Court went even further, finding that a putative class action against "bZx DAO" could proceed and that the plaintiff had alleged facts sufficient to support a claim that a general partnership existed among the token holders of the bZx DAO. *Sarcuni* at *17. The *Sarcuni* complaint named bZx DAO and its successor, the Ooki DAO, as defendants, premising lability on "the existence of a general partnership among all persons holding BZRX tokens." *Id*. at *2. In finding that the complaint pled sufficient facts, the Court noted the sharing of profits, and ability to vote on governance proposals.

Likewise, in *Commodity Futures Trading Commission v. Ooki DAO*, the Court found that the CFTC sufficiently alleged that Ooki DAO has the capacity to be sued as an unincorporated association. *CFTC* at *8. There, the complaint named "Ooki DAO (formerly dba bZx DAO), an unincorporated association" as the sole defendant. CFTC filed a complaint against Ooki DAO for violating the Commodity Exchange Act (CEA) by not registering with the CFTC and not conducting customer due diligence. *Id*. Amici curiae arguing on behalf of the DAO made the familiar contention that "Ooki DAO is a technology, not an entity or group of persons, and so

suing it is akin to suing any other technology, or like trying to hold 'the internet' liable." *Id*. at *6. The Court disagreed, finding Ooki DAO to be an "unincorporated association" and allowed the case to proceed. *Id*. at *8.

Defendant's operations fall squarely in line with its DAO brethren, compelling the conclusion that it is a juridical entity that may be brought before this Court.

### B.    MakerDAO is a General Partnership Capable of Being Sued

The owners and members of Defendant's self-described "organization" operate a for-profit business operation that makes sales, issues profit distributions, and engages in corporate governance —among other business operations—all in this District and throughout the U.S. (Dkt. No. 30, Exh. A, p. 2; Dkt. No. 19, n. 1; Boag Decl., Exh. R).[4]

Defendant holds itself out as "decentralized" and "autonomous," meaning that it is run by its members and not by any central authority. (Compl. Exh. 2, p. 2). Defendant also self-identifies as an "organization," i.e., a group of people organized for a joint purpose (*Id*., pp. 2, 5, 11), also known as an association. This alone meets the criteria for a partnership under New York law:

> A partnership is an association of two or more persons to carry on
> as co-owners a business for profit and includes for all purposes of
> the laws of this state, a registered limited liability partnership.

N.Y. Partnership Law § 10.

When there is no known *written* partnership agreement among the parties, a court may determine that a partnership in fact existed from the conduct, intention, and relationship between the parties.[5] *Czernicki v. Lawniczak*, 74 A.D.3d 1121, 1124 (N.Y. App. Div. 2010) *citing*

---

[4] Defendant's contention that the Complaint "concedes that MakerDAO is not a corporation, LLC, or partnership" is demonstrably false. Plaintiff merely stated the obvious: MakerDAO is "***is not formally* organized** as a corporation, LLC, partnership or other recognized organization type." (Compl. ¶ 9) (emphasis added).
[5] The presence or absence of such an agreement remains unclear at this time, although the Defendant's ability to directly and indirectly marshal considerable legal resources on several occasions suggests some agreement may exist.

*Community Capital Bank v. Fischer & Yanowitz*, 47 AD3d 667, 668, 850 NYS2d 508 (2008);

*Brodsky v Stadlen*, 138 AD2d 662, 663 (1988).

The dividing line between an unincorporated association and a partnership is generally the presence of ownership, engagement in a business, and pursuit of profit. *See, e.g., VIDIVIXI, LLC v. Grattan*, 155 F. Supp. 3d 476, 481 (S.D.N.Y. 2016) (finding the existence of a partnership where the partners (1) both contributed to businesses losses financially through labor and expertise; (2) worked together to design, fabricate, and market company products; and (3) held themselves out as partners).

Factors to be considered in determining the existence of a partnership include: "(1) sharing of profits, (2) sharing of losses, (3) ownership of partnership assets, (4) joint management and control, (5) joint liability to creditors, (6) intention of the parties, (7) compensation, (8) contribution of capital, and (9) loans to the organization." *Brodsky v. Stadlen*, 138 A.D.2d 662, 663 (N.Y. App. Div. 1988) (finding no partnership existed where there was no indication that plaintiff was liable for losses of the enterprise and made no management decisions). *Cf. Czernicki*, 74 A.D.3d at 1124 (N.Y. App. Div. 2010) (finding a partnership using these same factors).

Defendant more than satisfies these factors and qualifies as a general partnership. A summary of the most salient of the *Brodsky* factors is set forth below.

### 1.      Joint Management and Control

Defendant engages in shared management and control among its members. The MKR token gives its holder a proportional interest in MakerDAO as well as rights to propose, direct, and vote on MakerDAO governance:

> MKR holders manage the Maker Protocol and the financial risks of
> Dai to ensure its stability, transparency, and efficiency. MKR voting
> weight is proportional to the amount of MKR a voter stakes in the
> voting contract, DSChief. In other words, the more MKR tokens

locked in the contract, the greater the voter's decision-making power.

(Compl. Exh. 2, pp. 2-3). The holders of the MKR token each manage the MakerDAO Protocol and the financial risks of Dai. Ownership of MKR tokens entitles the holder to participate in various governance functions, including: (a) adding a new collateral asset type; (b) changing the risk parameters of one or more existing collateral asset types; (c) altering the Dai savings rate; and (d) triggering an emergency shutdown of the system. (Compl. Exh. 2, p. 15).

While Defendant contends that its MKR governance token is "transient, anonymous, and unidentifiable" (Dkt. No. 76, p. 1), in reality, MakerDAO governance token ownership and operations are highly centralized with respect to voting and control outcomes. (Compl. ¶ 34). By way of example, a 2022 vote asked MKR owners whether they approved a proposal to post approximately $1.6B of its positions with the centralized cryptocurrency company Coinbase, which would enhance MakerDAO's treasury operation profitability. (Dkt. No. 11., Exh. P). The vote reporting shows a concentration of voting, with the top *four* voting addresses accounting for more than 57% of the total votes. (Dkt. No. 11., Exh. C). Defendant's management is not nearly as diffuse as it suggests.

## 2.   Sharing Profits and Losses with Members

Defendant shares its profits with its members, satisfying another of the *Brodsky* factors. Profits may be distributed to owners in a number of ways, including the payment of compensation to MKR owners for their participation in administration and governance, and through MakerDAO's "MakerBurn" program where the DAO uses its earned DAI token (i.e. cash earnings) to repurchase (or "buy back") MKR tokens in the open market for the purpose of creating a relative scarcity of tradable MKR token and presumably increasing the MKR token price (through so-called MKR tokenomics "deflation"). (Boag Decl., Exh. R).

As just one example, holders of Defendant's MKR token saw monthly profits of nearly $3M in late 2020. (Dkt. No. 30, Exh. 11 (describing July 2020 monthly net income of $120,629; October 2020 net income of $2,463,493; and November 2020 net income of $2,742,284). *See also* Boag Decl., Exh. Q (describing earnings per MKR token of $8.00 and "Maker Valuation Earning Yield" of 4.65%); Exh. R (describing scheme of "[u]sing excess DAI to buy back and then burn MKR tokens").

MakerDAO similarly shares losses among its members. Holders of the MKR token share in the losses of the organization. (Dkt. No. 31, Exh. K) (showing monthly losses of $1,825,813 and $1,199,680 in October and November 2022, respectively). Defendant's own whitepaper on "The Maker Protocol: MakerDAO's Multi-Collateral Dai (MCD) System" explains how losses of the organization may be attributed to members:

> In addition to its role in Maker Governance, the MKR token has a complementary role as the recapitalization resource of the Maker Protocol. If the system debt exceeds the surplus, the MKR token supply may increase through a Debt Auction (see above) to recapitalize the system. This risk inclines MKR holders to align and responsibly govern the Maker ecosystem to avoid excessive risk-taking.

(Dkt. No. 1, Attachment 2, p. 15). *See also* Boag Decl., Exh. S ("DAI is insured by the surplus buffer (owned by MKR holders) and MKR issuance. The DAI surplus buffer can be redeemed by DAI holders with an ES. MKR issuance in time of crisis is detrimental to MKR holders as it can come with a low issuance price."); Dkt. No. 30, Exh. A ("[t]he Voting Contracts, the Open Source Software and Service could fail in an unexpected way, resulting in the total and absolute loss of all of your funds, including MKR and other cryptocurrency, tokens or digital assets.");

### 3.    Joint Liability to Creditors

MakerDAO recognized that creditors, including tax authorities, could present a collective liability concern to holders of the MKR token. (Dkt. No. 30, Exh. J, p. 13) ("So we need a shield

around all our members—not only those who live in or have seizable [sic] assets in the US. We also need to definitively establish jurisdiction for Maker to live in so we don't suddenly find not just the US, but multiple countries claiming Maker owes taxes on the same income.")

Recognizing that creditor liability was an issue, MakerDAO created a "Resilience Fund" ("RF"), a self-insurance instrument fully controlled and funded by Maker Governance, for the purpose of covering legal defense expenses in case of legal or regulatory action against the DAO or active participants in the Maker ecosystem. (Boag Decl., Exh. U). This fund not only reflects the existence of joint creditor liability among MKR holders but is itself and example of such liability. Accordingly, this *Brodsky* factor is met.

### 4.    Ownership of Partnership Assets

Defendant's ownership of assets further suggests that it is a general partnership. While not real estate, electronics, or traditional physical property, Defendant's organization itself owns thousands of MKR tokens that it holds for the purpose of treasury management and distribution to MakerDAO members and administrators:

> Earlier today, the Maker Foundation returned 84,000 MKR from the Development Fund to MakerDAO. In particular, these MKR tokens were transferred to the DSPause Proxy smart contract in the Governance Module, and are now under the control of Maker Governance. The transaction was completed at 01:23:36 PM UTC in block number 12361485, and readers can independently verify it by reviewing the transaction hash on Etherscan.
>
> *   *   *
>
> The Foundation has placed no conditions or expectations on MakerDAO regarding the returned MKR. Instead, MKR holders, much as they do in governing the Protocol, have total independent control to decide how (or if) they incorporate this MKR into their future plans.

(Boag Decl., Exh. T). The ownership of this property by the organization further suggests that it should be treated as a general partnership.

5.       **Intention of Parties**

Defendant describes itself as "the engine of the decentralized finance (DeFi) movement," and boasts of having "hundreds of partnerships." (Compl. Exh. 2, p. 23). Defendant's own words evidence its intent to operate as a concerted enterprise and a force in the decentralized finance space. Defendant has gone so far as to articulate a plan referred to as its "Endgame" that sets forth its goals and intent in stark terms:

> This [the Endgame Plan] enables Maker to deliver on the promise of creating an Unbiased World Currency that is reliable as fundamental infrastructure for both the crypto ecosystem and the global economy, regardless of how external factors may attempt to impact it."

(Boag Decl., Exh. V). To put it mildly, Defendant's aspirations for the organization are grand:

> Maker today is uniquely positioned to take the next leap in crypto history by being the first DAO to start scaling up, ultimately to the size of a decentralized Google or Amazon; a vibrant ecosystem with dozens of teams developing the protocol in parallel and running decentralized financial services all over the world. To succeed, the one thing we need to do is keep attracting new top talent and retain it in the long run.

(Boag Decl., W). Defendant's own words describe an intent to a crypto-banking enterprise on a scale the size of Amazon or Google, two of the largest tech organizations in human history.

6.       **Compensation**

Compensation is paid to members of Defendant's organization. Boag Decl., Exh. G ("The best way to pay DAO teams and oracles given the constraints on the size of the buffer, is to do payment streaming - paying teams directly out of the buffer on a second-by-second basis, with the actual transactions happening at regular intervals."); *Id.* at Exh. P, p. 4 ("Key financial results for the Maker protocol. Net protocol operation earnings of 19m DAI on total revenues of 65m DAI, inclusive of compensation expenses").

Defendant provides budgets for what it describes as a "salary" for certain personnel:

> The budget itself gives the CoreUnit enough wiggle room…Given the relatively low salary the vesting of 250MKR is a good compensation from my point of view…I am certain Andrew will do a great job…"

(Dkt. No. 30, Attachment 8, p. 46).

Salary payments and compensation are yet another hallmark of a general partnership and further compel the conclusion that Defendant is a general partnership.

### 7.    Contribution of Capital

Defendant's membership generally contributes capital to the organization in the form of MKR tokens and "the MKR token has a complementary role as the recapitalization resource of the Maker Protocol" (Compl., Exh. 2, p. 15). In addition to its role in governance, the MKR token has a "complementary role as the recapitalization resource of the Maker Protocol." (Compl. Exh. 2, p. 15). As explained in by Defendant:

> If the system debt exceeds the surplus, the MKR token supply may increase through a Debt Auction (see above) to recapitalize the system. This risk inclines MKR holders to align and responsibly govern the Maker ecosystem to avoid excessive risk-taking.

(*Id.*)

### 8.    Loans to the Organization

Members of Defendant's organization may make loans to the organization. Again, as explained by Defendant, loans in the form of a "savings account" may be established, which provide a return to the lender/depositor:

> Once generated, bought, or received, Dai can be . . .  held as savings through a feature of the Maker Protocol called the Dai Savings Rate (DSR).

(Compl. Exh. 2, p. 6). The DSR enables any token holder to earn a return on their deposit. (Compl. Exh. 2, p. 13).

\* \* \*

-17-

Defendant MakerDAO meets both the statutory definition of a partnership under New York law and the factors set forth by courts to make a factual determination on whether a partnership has been formed. Here, Defendant's sharing of profits through distributions, sharing of losses, and strong joint management mechanism that enables partner control and authority in proportion to the partner's holdings in the organization, all make clear that a general partnership has been created under New York law. Labeling an organization as "decentralized" and employing a clever computing system does not render it immune from all forms of civil (or tax) liability.

### C.      Token Holders Are Collectively Engaged in a Common Profit Purpose

MakerDAO's own public disclosures reporting label, quantify, and disclose profits, using the "PnL" shorthand for "profit and loss." *See e.g.*, "MakerDAO Financial Presentation," Dkt. 30, Exh. 11. As just one example, the "MakerDAO Financial Presentation" reports "Net Income" (a.k.a. profit) resulting from "Net Interest Income," "Net Trading Income," "Net Liquidation Income," and "Workforce expense" (a.k.a. compensation or salaries). *Id*. This is the collective purpose of Defendant.

Related to the pursuit of profit, the MakerDAO community is likewise motivated to minimize (or reduce to zero) its tax liability and regularly discusses the same:

> US history has many examples of a single member of a general partnership being forced to pay the entire tax burden of their partners. Given the current political climate in the US, desire to increase spending, and growing worry over how to pay for that, I cannot foresee Maker – which pays taxes exactly nowhere – escaping notice, perhaps in multiple jurisdictions at once. Note that the final, late deadline for last year's tax filings in the US is about to pass in less than two weeks.

(Dkt. No. 30, Attachment 10, p. 1).

> Our problem is mainly that of liability and taxation. Maker in the US will almost assuredly be seen as a general partnership. I have yet to hear a lawyer say It would not be.

(*Id.* at p. 13).

> So we need a shield around all our members — not only those who
> live in or have seizable [sic] assets in the US. We also need to
> definitively establish jurisdiction for Maker to live in so we don't
> suddenly find not just the US, but multiple countries claiming Maker
> owes taxes on the same income."

(*Id.*).

The related pursuits of profit and tax reduction is the common purpose of Defendant.

Defendant suggests that MakerDAO's whitepaper (Compl. Exh. 2) rebuts the idea of MakerDAO and MKR tokenholder "profits." (Dkt. No. 76, p. 22). This is contradicted by the foregoing and the whitepaper itself, which references "revenues," "fees," and "income streams." (Compl., Exh. 2 at 15).

**D.     MakerDAO Operates in the U.S.**

Investment and ownership tokens in MakerDAO are freely tradable in the U.S. on the largest cryptocurrency exchanges including Coinbase, Gemini, and Kraken. Similarly, access to MakerDAO's Dai-based services is available throughout the U.S. (Compl. ¶ 8), Coinbase, Gemini and Kraken are all U.S.-headquartered companies selling to U.S. clients, and where MakerDAO distributed, used, and sold the DAI system in the U.S. through its own channels of related companies operating in the U.S., including "Oasis" (a.k.a. Oasis Trade) and rebranded "Summer,fi." (Boag Decl., Exhs. B, C).

The Complaint also details MakerDAO operations on the Ethereum blockchain. (Compl. ¶¶ 4-7). It is known that deployment, distribution and operation on the Ethereum blockchain is, by Ethereum's inviolable operations, operation-in-the-U.S., contradicting Defendant's motion. Among other details, the Complaint states that: (i) "MakerDAO establishes the MakerDAO blockchain data environment which includes the MakerDAO Multi-Collateral Dai (MCD) System, the Oracle Security Module, and related system components" (Compl. ¶ 32); (ii) it is "controlled

and       operating       at       the       Ethereum       blockchain       address 0x9f8f72aa9304c8b593d555f12ef6589cc3a579a2" (Compl. ¶ 4); where (iii) "Asset prices are signed using Ethereum keys." (Compl. ¶ 7); and (iv) "Multi Collateral Dai (MCD), being released and live on the main Ethereum network." (Compl. ¶ 61).

Defendant's motion misrepresents the Ethereum environment and operations. The Ethereum environment is popularly described as "distributed," and Defendant uses this misleading "distributed" shorthand and MakerDAO's disguising of street addresses to somehow claim that MakerDAO's system is not deployed and operated in the United States. However, the Defendant carefully omitting at least two fatal determinative facts relating to Ethereum and its own systems.

Ethereum is comprised of a collection of duplicative nodes where all nodes perform duplicative operations, and all nodes perform all Ethereum's transactional operations including smart contract executions. (Boag Decl., Exh. I). Second, because MakerDAO has elected to use the Ethereum blockchain, its deployments, sales, distributions, determinations, processing, use, etc. are all happening in the United States regardless of MakerDAO's street address, the location of any specific transaction, or the location of any specific holder. (Boag Decl., Exh. I) ("blockchains do decentralization by replication, not distribution. This means that hundreds or thousands of nodes scattered worldwide store and compute blockchain data. As already pointed out, this data isn't *distributed* across many nodes, where each node would process different pieces of data **but instead replicated across multiple nodes, meaning each node stores and processes the same data**.") (emphasis added).

In support of its technical argument, Defendant cites *U.S. Securities and Exchange Commission v. Ian Balina*, Civil Action No. 1:22-CV-950 (W.D. Tex. filed Sept. 19, 2022).

However, *Balina* concerned securities regulation of Ethereum-hosted investments and "clustering" and not the territoriality issue presented here.

The inherent redundancy of all nodes in the Ethereum network likewise negates the conclusions of Defendant's "method claim analysis. (Dkt. No. 76, p. 28). Under the inescapable "laws" of operating over and within the Ethereum environment, all use occurs on thousands of nodes in the United States. The same logic applies to the "system and apparatus claim analysis." (*Id*. at pp. 28-29). Thousands of controlling points of the accused system are located in the United States as an inescapable result of operating on the Ethereum network, where all nodes control the system regardless of the location of an originator or recipient of the transaction.

Defendant's contention that the Complaint "admits that MakerDAO operates globally and has no address or locations in the United States" is demonstrably incorrect. (Dkt. No. 76, p. 9). That MakerDAO strategically hides street addresses while operating as a voting token-controlled business organization through a combination of staffed governance, staffed core units, and appointed administrators selling and deploying its products on internet hosted blockchains, gives MakerDAO all the hallmarks of a conventional business partnership or association.

MakerDAO is fundamentally the same as many post-COVID pandemic technology business and companies which have moved to a completely or largely remote workforce, trading street addresses for an on-line presence. Further, MakerDAO's own publicly released internal documents highlight MakerDAO's deep U.S. nexus risks related to U.S. personnel, U.S. tax liabilities, and other U.S. legal liabilities. (Dkt. No. 31 n 2).

While Defendant contends that its governance token is "transient, anonymous, and unidentifiable," in reality, MakerDAO governance token ownership and operations are highly centralized with respect to voting and control outcomes. (Compl. ¶ 34). In a public MakerDAO

post, and in response to *Commodity Futures Trading Commission v. Ooki DAO* (3:22-cv05416),
the Court effectively finding that the DAO is a legal person, MakerDAO founder Rune Christensen
concedes that MakerDAO is neither autonomous nor decentralized:

> Maker have already long ago completed the same steps that Ooki
> DAO did, but that does not protect us from the trajectory of crypto
> regulation and enforcement that is in motion following the erasure
> of crypto goodwill due to Terra, Celsius etc.
>
> * * *
>
> So we have to assume that we have several years available to take
> the necessary steps and in the medium term prepare to become a real
> and uncompromised decentralized finance protocol operated by a
> real and uncompromised decentralized autonomous organization.

(Dkt. No. 30, Exh. W).

### E.      Public Policy Considerations

If as argued by Defendant, MakerDAO can operate as a cryptocurrency bank in the U.S.,
freely using patented technologies through claims of "being nowhere," MakerDAO's partners can
engage in and commit almost any transgression or financial crime in the U.S. with impunity
including technology theft, money laundering, securities fraud, terrorist funding, and
institutionalized tax evasion.  Taking this structure to its logical extreme, a less conscientious DAO
could conceivably execute a full ransacking of customers funds and remain beyond the reach of
any authority.

While it is not suggested that Defendant or its members have or would engage in such
activity, MakerDAO is in fact structured to avoid certain legal consequences, a characteristic
enjoyed by its owners. *See, e.g.*, Dkt. No. 30, Attachment 10, p. 1 ("Our problem is mainly that of
liability and taxation. Maker in the US will almost assuredly be seen as a general partnership. I
have yet to hear a lawyer say It would not be."). Defendant's clever structuring and technology
should not and do not enable it to evade the laws of the U.S.

## IV.     CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendant's

Motion to Dismiss.


Dated: December 6, 2023                        **BOAG LAW, PLLC**

By:

David A. Boag
447 Broadway, Suite 2-270
New York, NY 10013
dab@boagip.com
*Attorneys for Plaintiff True Return Systems, LLC*